**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DREW DIXON,

        Plaintiff,                             Case No.:

v.

ANTONIO MARQUIS "L.A." REID,

        Defendant.

_____ /

## **COMPLAINT**

Plaintiff Drew Dixon, by and through her undersigned counsel, makes the following allegations against Defendant Antonio Marquis "L.A." Reid upon personal knowledge as to her own acts and status and upon information and belief as to all other matters:

## **INTRODUCTION**

1.      Drew Dixon is a music producer, entrepreneur, former General Manager of John Legend's record label, former Grammy voter, former senior A&R executive, and an Advisory Board Member at New York University's Clive Davis Institute of Recorded Music.  Over the course of her storied, yet interrupted career, Ms. Dixon facilitated the recording of iconic songs such as "American Boy" (Estelle featuring Kanye West), "My Love Is Your Love" (Whitney Houston), "Maria Maria" (Carlos Santana), "A Rose Is Still a Rose" (Aretha Franklin featuring Lauryn Hill), "I'll Be There for You (You're All I Need)" (Method Man featuring Mary J. Blige) and many more.

1

2.      Ms. Dixon's career was derailed when, not one, but two of her supervisors, sexually assaulted her. After the first sexual assault, Ms. Dixon showed resilience and used her tenacity and talent to secure another position at Arista. There, Antonio Reid, aware of the first sexual assault at the hands of Russell Simmons, sexually harassed Ms. Dixon and refused to allow her to succeed unless she acquiesced to his demand to be alone and in close proximity to her, where he would create the opportunity to sexually assault her on two separate occasions.   When Mr. Reid committed these sexual assaults, he did not use a knife or a gun, such weapons were unnecessary, because he held full control of Ms. Dixon's career and livelihood in his hands.  Despite her well recognized ability, her path to success, in an industry where women were expected to yield, would vanish if she did not remain compliant and silent.  The proof: any time she rebuffed him, some of the world's most renowned talent paid the price of career stalls.

3.      This litigation is not only about the horrific physical assaults that Ms. Dixon had to endure, but it is also about the irreparable damage done to the rare and blossoming career of an extraordinary talent described by one industry insider as the "female Rick Rubin."  This litigation is about the permanent disruption of Ms. Dixon's previously meteoric trajectory, decades of lost earning power, the missed producer points on Kanye West and John Legend, and countless thwarted professional opportunities and suffocated momentum, all of which cost her millions of dollars.  Moreover, the world has missed out on the talented, undeveloped artists that Ms. Dixon attempted to promote while trying to avoid Reid's abuse.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Drew Dixon is domiciled in Brooklyn, New York.

5.      Defendant Antonio Marquis "L.A." Reid is domiciled in Los Angeles, California.

6.     The amount in controversy in this action exceeds the sum or value of $75,000.00 excluding interest and costs and is between citizens of different states. Accordingly, subject matter jurisdiction is proper under 28 U.S.C. § 1332.

7.     This Court has personal jurisdiction over this matter as the sexual abuse of Ms. Dixon by Mr. Reid began and occurred in New York, New York.

8.     This action has been timely filed under New York's recently passed Adult Survivors Act (S.66A/A.648A), N.Y. C.P.L.R. § 214-j (hereinafter the "ASA"), which, beginning on November 24, 2022, created a one-year lookback window for the survivors of sexual assault that occurred when they were over the age of 18, allowing them to sue their abusers regardless of when the abuse occurred.   Like the Child Victims Act, N.Y. C.P.L.R. § 214-g, the ASA is a landmark piece of legislation for survivors of sexual abuse to file claims otherwise barred by the statute of limitations.   Ms. Dixon was a leading voice in helping with the passage of the ASA.

9.     The actions described herein constitute sexual offenses by Mr. Reid under New York Penal Law Article 130 and were committed against Ms. Dixon when she was over the age eighteen years, for which she suffered physical, psychological, and other significant injuries as a result.

10.     The events giving rise to these causes of action occurred in the Southern District of New York, where Mr. Reid sexually assaulted Ms. Dixon.   Thus, venue in this district is proper. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.     Drew Dixon**

11.     Ms. Dixon, the youngest child of Sharon Pratt and Arrington Dixon, had an impressive ear at an early age.   As a young child growing up in Washington D.C., she studied

violin and piano, and she loved listening to her great-grandmother, Hazel Pratt, playing the piano. Ms. Pratt would flow easily from gospel to show tunes on the piano, and Ms. Dixon would lie in her bed and soak up every note from the baby grand piano.  As a teenager, Ms. Dixon's affinity for recorded music emerged, and she began to create eclectic mix tapes on her mom's stereo system.

12.    Ms. Dixon became fixated on precisely sequencing the songs in order to establish the perfect flow.  She painstakingly created transitions, and she began to study the liner notes and credits on the backs of the albums in her mom's record collection and her own.  Ms. Dixon became increasingly interested in the roles the album covers described: engineer, mixer, producer, arranger, background vocalists, session players.  She rummaged through her mother's albums to find lesser-known tracks by artists like Earth Wind & Fire, Parliament Funkadelic, Luther Vandross, Anita Baker, Stevie Wonder, Billie Holiday, Hall & Oates, Bread, and Spandau Ballet. She loved to mix those songs with music by her favorite artists like The Smiths, The Beatles, The Doors, Echo & the Bunnymen, Sade, Prince, and local D.C. go-go artists like Rare Essence, Junkyard Band, and Chuck Brown.  Ms. Dixon stayed up into the wee hours of the morning with giant headphones over her ears experiencing music on a different level than others.  As they say in the music industry, before she even knew it, Drew Dixon had "great ears."

13.    Ms. Dixon graduated from the National Cathedral School for Girls in D.C. to attend Stanford University.  At Stanford, she majored in history, but on weekends she made her way to Oakland and San Francisco to check out the Bay Area's burgeoning music scene.

14.    After Stanford, Ms. Dixon worked in an internship at Jive Records, and then in an internship at Warner Brothers Records, and later as a receptionist at Empire Artist Management. She landed her first job as a junior executive at Zomba Music Publishing in New York City, where

she signed the now legendary rapper, Nas, and hip-hop producer, Erick Sermon, to publishing deals.  In that capacity, Ms. Dixon met Mr. Reid for the first time in 1993, when she attended the mastering session for the debut album from a band and production team she had heard on a sampler tape and hoped to sign.  The band was Outkast, and the production outfit was Organized Noize.  Mr. Reid indicated how impressed he was that Dixon, a young publishing executive in New York was aware of Atlanta's Outkast and Organized Noize, let alone already positioning herself to secure a deal.  Before she was able to pursue her interest in a publishing deal for Organized Noize, Ms. Dixon was offered a job at Def Jam Recordings as a Director of A&R.  She leapt at the chance.

15.     While at Def Jam, Ms. Dixon worked with prominent artists like Montel Jordan and Method Man.  Ms. Dixon was so inspired by an acapella interlude that she heard while typing the credits for Method Man's debut album that she urged her boss, Russell Simmons, to let her explore an idea to transform the acapella vocal into a duet with Mary J. Blige.  Ms. Dixon oversaw every aspect of the recording the song that became "I'll Be There for You (You're All I Need)."  She started by convincing Puff Daddy to secure Mary J. Blige's vocals, and then she coordinated Puff Daddy's production of the song along with the Razor-Sharp remix by legendary Wu-Tang Clan producer, RZA, booking the studios and equipment for the sessions, hand-delivering the reels each day to both Puff Daddy at the Hit Factory studio where he was working on the track, and Chung King studios where RZA was producing the remix.

16.     During this time, Ms. Dixon was overseeing the production of *The Show: The Soundtrack*.  She called her favorite artists in her attempt to represent a wide range of hip-hop genres and styles and secured tracks from artists like 2Pac, Bone Thugs-n-Harmony, and The Notorious B.I.G.  Just as she had done as a teenager with her mixtapes, Ms. Dixon painstakingly sequenced the album and even chose interludes from the film that she interspersed throughout.

5

Ms. Dixon's work on *The Show: The Soundtrack* earned her an executive producer credit, sold a million copies, and debuted at number one on the Billboard R&B album chart.

17.     At Def Jam, Ms. Dixon also signed dancehall artists, Capleton and Kali Ranks, inspiring the creation of the Def Jamaica imprint.  She oversaw the recording of the "Wings of the Morning" remix by Capleton featuring Method Man, the recording of a duet called "The Perfect Match" by Kali Ranks featuring Lauryn Hill, and the Puff Daddy remix of "This Is How We Do It" by Montel Jordan.

18.     At the height of her success at Def Jam in 1995, and as *The Show: The Soundtrack* sat at the top of the Billboard R&B Chart, Russell Simmons brutally raped Ms. Dixon, forcing her abrupt departure from the job she had worked so hard to get.

19.     After reeling for several months following the assault by Mr. Simmons, Ms. Dixon picked herself back up and accepted a job as Senior Director of A&R at Arista Records.  A few years later, Arista founder and president, the legendary producer, Clive Davis, recognized her talent and promoted her to Vice President of A&R at Arista Records.  She was officially back.

20.     Ms. Dixon was prolific at Arista.  Over the course of her career at Arista, Ms. Dixon tapped into her network from the hip-hop music industry and signed artists like Q-Tip, from A Tribe Called Quest, Brand Nubian, Dyme, Andrea Martin, Edith's Wish, and Toya.  Her most significant contribution came in her ability to identify hit songs like "My Love Is Your Love," which was given to her by Wyclef from The Fugees for Whitney Houston, and "Maria Maria," also given to her by Wyclef for Carlos Santana.  Lauryn Hill of The Fugees gave her "A Rose Is Still a Rose" for Aretha Franklin.  Montel Jordan played her two songs, "Nobody's Supposed to Be Here" and "We Can't Be Friends," which became hits for Deborah Cox.  In addition to those songs, Ms. Dixon worked with Whitney Houston on "Heartbreak Hotel" and "It's Not Right but

It's Okay" and received A&R credits for both songs as well as for the *My Love Is Your Love* album. Ms. Dixon also worked on "Angel of Mine" and "The Boy Is Mine" for Monica. Ms. Dixon was involved in every aspect of the album recording process, from working with the artists, picking the tracks, coordinating the recording sessions, planning and managing the budgets, and ensuring on-time delivery and the technical integrity of recordings. She worked closely with the lawyers in business affairs to close artist and producer deals, to secure features from artists on other labels, and to clear samples. She also coordinated with the marketing, promotions, publicity, and production departments once the music was complete to help ensure the successful launch of artists, albums, and singles. As part of her deal at Arista, Ms. Dixon was guaranteed a royalty point on any new artist that she signed.

21.     When Ms. Dixon initially started at Arista in 1996, she signed a five-year deal to join the A&R department. She reported directly to Clive Davis and worked closely with Arista General Manager and Executive Vice President, Roy Lott. Her working relationship with Mr. Davis, Mr. Lott, the legal team, the other A&R executives, and the overall staff at Arista was professional and mutually respectful. Ms. Dixon garnered the admiration of her colleagues at Arista and throughout the industry. Mr. Lott has described Ms. Dixon as a multifaceted talent in that she was not only able to advise on albums in her known genre of hip-hop, but her opinion was valued on projects in other genres, including pop and country.

22.     In her role reporting to Mr. Davis, first as Senior Director of A&R and later as Vice President of A&R, Ms. Dixon also interacted with Mr. Reid, whose Atlanta-based label, LaFace Records, was a joint venture with Arista. In all of her interactions with Mr. Reid, their rapport was professional, creative, productive, and mutually respectful just as it had been since their first meeting at the Outkast mastering session in 1993. Mr. Reid often invited Ms. Dixon to the

mastering sessions for his artists so he could get her take on the new music.  In all of the years that Ms. Dixon attended the mastering sessions with Mr. Reid, while he was still running LaFace and while she was still reporting to Mr. Davis, Mr. Reid was professional and respectful.  On one occasion, when Ms. Dixon sat in for the mastering of the *FanMail* album by LaFace Records superstars, TLC, Ms. Dixon argued strongly in favor of changing the first single to "No Scrubs." Shortly before she started reporting to Mr. Reid, he acknowledged Ms. Dixon's role in helping him to make the right choice, further bolstering Ms. Dixon's confidence that Mr. Reid's interest in working with her was based on his respect for her exceptional ear as an A&R executive and music producer.

23.     Upon learning that Mr. Reid would replace Mr. Davis as her boss, Ms. Dixon was torn.  Staying was highly encouraged by the CEO of Arista's parent company, BMG, Strauss Zelnick, who called Ms. Dixon several times during Mr. Reid's takeover urging Ms. Dixon not to join Clive Davis at J Records.  And before the change, Dixon had contemplated starting her own label when her Arista deal expired at the end of eighteen months.  If Ms. Dixon had joined J Records, she would have had to sign a new five-year contract.

24.     Her decision had been further complicated by a recent cancer diagnosis and surgery to remove one kidney.  Although her initial decision had been to join J Records, she did not want to make such a long-term commitment, having just confronted her own mortality, so she decided to stay at Arista and report to Mr. Reid for the remaining eighteen months in her deal.  She had no reason to believe that the nature of her relationship with Mr. Reid, dating back to their first meeting at the Outkast mastering session seven years earlier, would take such an awful turn as soon as her career was in his hands.  Thus, when Arista came under Mr. Reid's direction, Ms. Dixon declined to go to J Records with Mr. Davis.  She also turned down an offer to work for Roy Lott, who had

previously offered her a job to be an executive at Capital and then later at Virgin records.  Ms. Dixon decided to stay put at Arista and chart her course in the music industry in a more entrepreneurial light.  She set up an LLC called Possum Records and laid the groundwork for the next chapter of her career, but that would never come to pass.

**B.**     **L.A. Reid**

25.     L.A. Reid is a Grammy Award winning record executive, who is known for signing hitmakers.  Mr. Reid started his music career as a drummer in a funk rock band, but he found mainstream success as a member of an R&B band called The Deele alongside Kenneth "Babyface" Edmonds.

26.      After the band disbanded, Mr. Reid and Babyface founded LaFace Records with funding from Clive Davis as a joint venture with Arista Records in 1989.  The label quickly became synonymous with hit records and chart-topping success developing acts like Usher, Toni Braxton, TLC, Pink, Outkast, Avril Lavigne, Rihanna, and Mariah Carey at its height.

27.     In 2000, LaFace merged into Arista Records, and Mr. Reid succeeded Clive Davis as president and CEO, and continued to run the firm with much financial success.

28.     In 2004, Sony and Arista's parent company BMG merged, and released Mr. Reid from his contract at Arista.

29.     After Arista, Mr. Reid is credited with the musical comebacks of both Jennifer Lopez and Mariah Carey, and he played a role in the successes of Rihanna, Justin Bieber, Bon Jovi, and Kanye West.

30.     Mr. Reid is also a successful songwriter with credits on songs including "Don't Be Cruel" by Bobby Brown, "I'm Your Baby Tonight" by Whitney Houston, "End of the Road" by Boyz II Men and "We Belong Together" by Mariah Carey.

31.     In 2011, Mr. Reid served as a judge on the hit reality TV show, X-Factor.

32.     Also in 2011, Mr. Reid became the CEO of Epic Records.  Four of Epic's artists debuted No. 1 albums under his direction: Future, DJ Khaled, Travis Scott, and A Tribe Called Quest, with Future releasing back-to-back No. 1 albums.

33.     In 2016, Mr. Reid published *The New York Times* bestseller *Sing to Me: My Story of Making Music, Finding Magic, and Searching for Who's Next.*  Although Mr. Reid initially passed on Kanye West when Ms. Dixon brought him in to audition at Arista, Mr. Reid later worked closely with Kanye West during his tenure as the head of Island Def Jam.

34.     In May 2017, following an accusation of sexual misconduct by an assistant at Epic Records, Mr. Reid abruptly exited the record label, and expanded his Hitco Publishing Company into Hitco Entertainment in 2018.  In 2022, Hitco sold its assets and recording contracts to Concord Music Group.

35.     In 2020, Mr. Reid sold 100% of the publishing interest and Writer's Share of income for his catalogue of 162 songs to Hipgnosis and joined their board.  Although the particulars of the sale are unknown, Hipgnosis reported spending £1 billion ($1.26 billion) on acquisitions over a two-year period, during which Hipgnosis acquired Mr. Reid's music catalog.

36.     Earlier this year, Mr. Reid reunited with Usher to work on a new album to release through a new music company called Gamma.  Gamma has raised $1 billion in funding from Apple, among other investors, and according to media reports, Mr. Reid has an undisclosed ownership stake in the new company.

37.     An industry mogul, Mr. Reid's net worth is estimated to be between $300 million–$500 million.

C.     **Mr. Reid's First Assault on Ms. Dixon**

38.     Sexual exploitation and the power imbalance between women and men are pervasive in the culture of hip-hop and the music industry.[1]  Mr. Reid has historically leveraged his position as a gatekeeper in an industry that thrives on the sexual exploitation of women trying to break into the entertainment and music business.  Women in the industry are falsely promised opportunities and advancement by experienced and well-established, powerful men in positions to derail the careers of women who reject their advances or report sexual assault.

39.     Almost immediately upon his arrival at Arista in 2000, Mr. Reid began sexualizing and harassing Ms. Dixon.

40.     Before he even officially started working, Mr. Reid asked Ms. Dixon to join him and his new wife, Erica, with whom Ms. Dixon had been friendly at various industry events, to look at new apartments for their move from Atlanta to New York.  Ms. Dixon felt it was an odd request but thought perhaps he was planning to use his home as an extension of his office, so she agreed.

41.     After Ms. Dixon arrived with the realtor to look at the first apartment with the Reids, she realized that Mr. Reid's wife would not be joining at all.  During the entire afternoon of showings Mr. Reid made flirtatious comments.  It was so pervasive that it caused the realtor to comment to Ms. Dixon privately that he was left with the impression that Mr. Reid was "in love with her."

---

[1] *See, e.g.*, Believe, TuneCore, and Luminate, *Study – BE THE CHANGE: Gender Equality in the Music*, https://www.tunecore.com/wp-content/uploads/sites/12/2023/03/2023-Be-the-Change.pdf ("34% of women in the industry had experienced sexual harassment or abuse").

42.     In January 2001, Arista held a company-wide retreat in Puerto Rico.  Arista handled the travel and hotel fees associated with the trip and everything originated in New York.  Karen Kwak, the then-VP of A&R Administration, told Ms. Dixon at the last minute not to book her own flight, because Reid had invited a group of senior executives to join him on a private plane flying from Teterboro Airport so that they could go over all of the presentations one last time before sharing new music with the entire company at the retreat.

43.     Ms. Dixon was confused when she boarded the plane to find Mr. Reid all alone. He began flirting with her right away.  She went to the bathroom on the plane and tried to buy time waiting for other executives to arrive.  Eventually, she came out of the restroom and discovered she was still alone in the cabin with Mr. Reid.  He asked her to sit next to him to go over materials for the presentation, and then he began playing with her hair, kissing her and digitally penetrated her vulva without her consent.  Ms. Dixon spent the rest of the flight in a daze.

44.     Although all executives who were vice presidents and above were entitled to their own room at the hotel, Ms. Dixon decided to share a room with her assistant to avoid any possibility that Mr. Reid might try to find another way to be alone with her during the retreat. Throughout their time in Puerto Rico, Ms. Dixon stayed close to her assistant, so she would not be caught alone around Mr. Reid.  At one point, Mr. Reid complained that Ms. Dixon and her assistant were attached at the hip, but Ms. Dixon stuck with her strategy which worked while she was in Puerto Rico.  Ms. Dixon flew back from the retreat on a commercial flight.

### D.     Mr. Reid's Second Assault on Ms. Dixon

45.     Once back in New York, Ms. Dixon continued to avoid being alone with Mr. Reid. After Ms. Dixon learned Mr. Reid's patterns and characteristics, she used that information to avoid

him, while still trying to be cordial and do her job.  She attempted to dodge his overtures without offending and upsetting him.

46.     Ms. Dixon's reputation at Arista under Clive Davis was stellar.  She only had a few months left in her contract.  She knew well the pitfalls of resigning and rebuilding.  Ms. Dixon tried to just do her job.

47.     Though she tried to navigate the treacherous balance between maintaining a working relationship without succumbing to Mr. Reid's sexual advances, Ms. Dixon was unsuccessful at keeping Mr. Reid happy.  Mr. Reid retaliated against her by embarrassing her in front of others or otherwise being curt and unprofessional.  Ms. Dixon began to plan her escape, but unfortunately not before Mr. Reid would assault her again.

48.     One evening several months later in 2001, after a work event in New York City, Mr. Reid insisted that Ms. Dixon join him for a ride to drop her at home so they could continue to discuss work and he could listen to some of the music she had been waiting for him to review, including a demo of a promising young singer, Alice Smith.  It was commonplace in the urban music industry to listen to music on car stereos, which gave a different sound and experience than listening to music in a studio or even on great speakers in the office.  Mr. Reid also prided himself on the custom state-of-the-art sound system he had installed in his car.  Since it was not a very long ride and Ms. Dixon knew Mr. Reid's driver would be present, she agreed.  She also knew that if she continued to avoid Mr. Reid, she would never be able to get anything approved for her artists.  She assumed it would be safe to accept the ride and continue their conversation with the driver present.

49.     She was wrong.  Shortly into the ride, Mr. Reid again, without Ms. Dixon's permission or consent began to grope and kiss Ms. Dixon, who squirmed and pushed him away as

Mr. Reid's driver stared straight ahead.  When Mr. Reid complained and became visibly irritated with her lack of compliance, Ms. Dixon froze.  Mr. Reid again digitally penetrated Ms. Dixon's vulva without her consent.

50.     Once the car stopped in front of her residence, Ms. Dixon jumped out of the car while taking care not to anger Mr. Reid, because by this time she felt trapped.  As soon as she was alone in her building, she cried.  After this assault Ms. Dixon intensified her efforts to avoid Mr. Reid.  She knew that the repercussions at that time of saying that she was the victim of assault at the hands of another mogul would be career ending.  The blame would lie at her feet.

51.     She only told her life coach.  Ms. Dixon began seeing a life coach, a few years into her career at Arista, while she was still working for Clive Davis.  Dixon continued to meet with the life coach on a weekly basis through the end of her tenure with Reid.  Ms. Dixon only told her about the assaults and harassment.

**E.     Ongoing Sexual Harassment and Career Sabotage**

52.     Throughout the time they worked together Mr. Reid had a pattern and Ms. Dixon tried to navigate around it.  For instance, Mr. Reid would instruct executives to advise Ms. Dixon to wear skirts and high heels.  As a result of the harassment and assaultive behavior, Ms. Dixon started wearing jeans and Birkenstock clogs, which she knew Mr. Reid hated.  She thought these clothing choices would make it less likely that Mr. Reid would assault her, even if she was sitting close to him.

53.     Mr. Reid began to invite Ms. Dixon to meetings in his hotel room, night after night. He asked her to come to his hotel room to listen to music, and she told him she would be working in the studio until very late.  He told her that no matter how late it was when she finished in the state-of-the-art studio, she should call him and come over to his hotel room at the Four Seasons to

listen to music.  She never did, so he started calling her late at night.  The first few times she answered and said she would call him back.  He would get angry the next morning in the office when she had not followed through.  She told him she was tired and forgot.  He told her not to forget next time.  Eventually, she started letting his late-night phone calls go straight to voicemail, and he became angrier and angrier.  It was like a cold war.  He turned hostile towards her, and her artists, and her ideas.

54.     It was a drastic reversal from Mr. Reid's enthusiasm about her creative taste and instincts over the years, and harm came from the fact that Mr. Reid would directly respond to Ms. Dixon's rejection of his sexual advances by punishing the artists Ms. Dixon had already signed or by blocking the artists she attempted to sign.  Promotional and recording budgets were suddenly reduced dramatically or frozen altogether.  Song demos and artist auditions were flatly rejected.  Ms. Dixon could not do her job at Arista, and she became increasingly concerned that her stifled success at Arista would impede her ability to secure a similar job at another label.

55.     When Ms. Dixon and another colleague in the A&R department brought Kanye West in for an audition, Mr. Reid passed on the rapper and then proceeded to berate Ms. Dixon in front of the whole A&R department about how bad she was at her job and what a waste of his time the audition had been, all while Kanye waited in the lobby.

56.     A few months later, Ms. Dixon played Mr. Reid the demo for John Legend (then John Stephens) before he was an EGOT winner.  Mr. Reid blew off the demo, so Ms. Dixon invited Mr. Reid to join her to watch John perform at SOBs.  Mr. Reid agreed to come and offered Ms. Dixon a ride.  At the last minute, Ms. Dixon told Mr. Reid she would have to meet him there.  Mr. Reid was a no show, so Ms. Dixon sat at a table near the stage at SOBs and watched John perform with an empty chair by her side.  Ms. Dixon was so impressed by John's performance that she

brought it up again with Mr. Reid at the next A&R meeting.  She played the demo, and this time Mr. Reid listened.  He was impressed enough by the material that he agreed to pay for John to audition in a private rehearsal space.  With Mr. Reid's approval, Ms. Dixon booked a performance space at S.I.R. Rehearsal Studios and invited the Arista senior staff.  In the meantime, Mr. Reid resumed his requests that Dixon come to his hotel room to listen to music.  Again, Ms. Dixon avoided Mr. Reid, so on the day of John's audition, Mr. Reid canceled and told the entire senior staff not to go.  Since it was too late to cancel the performance, John and his band performed, and again, Ms. Dixon sat in the front row and watched John's show this time next to a row of empty chairs, unable to offer John a deal or even an explanation.

57.     Once she realized Mr. Reid would continue to stifle her career and the prospects of any of the artists she brought to him and that he would continue to undermine the artists she had already signed like Toya in order to punish Ms. Dixon for rejecting his sexual pressures, Ms. Dixon gave up not just on Arista, but on her dream of starting a label.  She left Arista to pursue an MBA at Harvard Business School in 2002.  Resigned to the fact that she would not ever be able to function in the music industry without being sexualized.

**F.     Long-Term Impact on Ms. Dixon**

58.     In 2004, after she graduated from Harvard with honors, Ms. Dixon would try again. She came back to the music industry, but under different circumstances and leadership.  She joined John Legend as a General Manager at Homeschool Records.  There, she worked with John to co-executive produce Estelle Swaray's U.S. debut album, *Shine*.  She was involved in every aspect of song selection, recording, mixing, and mastering the album.  She also suggested Kanye West as a feature on "American Boy" and arranged for him to record his vocals at Platinum Sound.  Ms. Dixon worked closely with the Atlantic Records staff on the marketing and promotional aspects

release of the "American Boy" single and the *Shine* album in multiple territories to ensure Estelle's

successful launch as a global star.  The resulting duet went on to win a Grammy.

59.     Unfortunately, by the time "American Boy" won a Grammy, Ms. Dixon had already

left the business.  When Estelle's album project moved from the recording stage into the marketing

and promotions phase, Ms. Dixon had to shift her time from the recording studio to the record

company itself.  Many of the top label executives at Atlantic happened to be her former colleagues

at Def Jam who were close friends of both Russell Simmons and L.A. Reid.  At industry events

with Estelle, Ms. Dixon ran into Mr. Reid and his enablers on several occasions.  The consistent

reminders of her humiliating experience with Mr. Reid triggered depression and drove Ms. Dixon

away from music again.  She found it unbearable to attend the industry events that were necessary

to promote and market the incredible album that she worked so hard on with Estelle and John,

because she often encountered Mr. Reid, Mr. Simmons, or their enablers and needed to be friendly

and sociable.  Ever resilient, Ms. Dixon then channeled her desire to make music by writing and

recording original music of her own.  When she shared some of her early songs with her friend

Lauryn Hill, Ms. Hill was impressed and encouraged her to stick with it.  It occurred to Ms. Dixon

that she might be able to re-enter the industry as a songwriter and producer which would allow her

to return to making records, but instead of dealing with gatekeepers and office politics, she could

spend her time in her favorite place to work, the recording studio.

60.     In addition to the positive response from Lauryn Hill, Kanye West also loved Ms.

Dixon's music.  He liked one of her compositions so much that he told her it had become the most

played song on his iPod a month after their meeting.  Encouraged by that feedback, Ms. Dixon

scheduled a meeting to drop off a cd of those songs with Mr. Reid, who was at that time the

President of Island Def Jam.  She still had not worked through the abuse she had experienced in

the music industry, so she blamed herself for not having thick enough skin to deflect Mr. Reid's advances without allowing it to derail her. Realizing she could not avoid him completely even in this new dimension of songwriting and production, she asked one of the producers of her songs to join her at the meeting. As a married woman and a mom, she thought she might be able to interact with Mr. Reid as a peer long enough to play him a few songs and perhaps place one of them with a few artists on his label.

61.     However, immediately upon seeing him in person for the first time in years, she regretted her decision. It was still painful to interact with him in any way, and it was a mistake to think she could return to the dynamic she shared with Mr. Reid before the assaults. She had planned to pitch her songs to Mr. Reid as possible material for the artists on his label. Instead of listening to the CD that she handed him to play, Mr. Reid insisted that she stand up and sing for him when he realized the vocals on the CD were hers. The armor of her MBA and her status as a married woman and a mom disintegrated, as the crass feeling of being objectified by Mr. Reid returned. No amount of time, education, marital status, or additional hit records would undo the harm of the assaults.

62.     The effects are ongoing. In 2017, Ms. Dixon met Ella Wylde, a young singer-songwriter whose music inspired Ms. Dixon to create her own record label, The Ninth Floor, named after the floor at Arista where she worked so productively with Clive Davis. Ella, who is now a freshman at the Clive Davis Institute of Recorded Music at NYU, is continuing to work with Ms. Dixon on new music.

63.     However, on at least one occasion, Ms. Dixon's attempts to secure a record deal for Ella were hampered by one of Mr. Reid's allies in the industry, who appeared to love Ella's music before becoming aware of Ms. Dixon's history with Mr. Reid, at which point communication

abruptly stopped.  Even now, decades later, Mr. Reid is punishing Ms. Dixon for having refuse to submit to his sexual demands.

G.   **Going Public**

64.     When Ms. Dixon began to tell her story publicly in 2017, she felt liberated, like a weight was lifted from her shoulders.  2017 was a year of reckoning for sexual abusers and harassers whose power and wealth had previously shielded them from accountability.  The #MeToo Movement had exploded into a global phenomenon, and seemingly untouchable people in power suddenly found their past actions catching up with them.

65.     In May 2017, Sony and Epic Records parted ways with Mr. Reid after an assistant at Epic Records accused him of sexual misconduct.

66.     In November 2017, Russell Simmons and filmmaker, Brett Ratner, were accused of teaming up to engage in sexual misconduct against model, Keri Claussen Khalighi.[2]

67.     In November 2017, the award-winning screenwriter Jenny Lumet published a first-person account in the Hollywood Reporter of being violated in 1991 by Russell Simmons, the king of hip-hop and cofounder of Def Jam Records, a contemporary of Mr. Reid.[3]  It was a watershed moment for Ms. Dixon, bringing to the fore a bundle of memories that she had worked hard to

---

[2] Hilary Lewis, *Russell Simmons and Brett Ratner Accused of Teaming Up to Engage in Sexual Misconduct*, The Hollywood Reporter, https://www.hollywoodreporter.com/news/general-news/russell-simmons-brett-ratner-accused-teaming-up-engage-sexual-misconduct-1059839/ (Nov. 19, 2017).

[3] Jenny Lumet, *Writer Jenny Lumet: Russell Simmons Sexually Violated Me (Guest Column)*, The Hollywood Reporter, https://www.hollywoodreporter.com/news/general-news/writer-jenny-lumet-russell-simmons-sexually-violated-me-guest-column-1062934/ (Nov. 30, 2017).

bury.  Ms. Dixon appreciated that Ms. Lumet's decision to speak out against Mr. Simmons must have been an excruciating one.

68.    On December 13, 2017, *The New York Times* published its article on Mr. Simmons. In the article, Ms. Dixon told her account of how Mr. Simmons sexually harassed her, sexually assaulted her, and violently raped her.  The article also briefly mentioned that Mr. Reid had harassed Ms. Dixon.  Although she revealed the assault in the car to the reporters at the New York Times, she has never publicly discussed Mr. Reid's assaults of her.[4]

69.    In addition to Ms. Dixon and the Epic Records assistant, it is believed that Mr. Reid and a previous employer "quietly settled a handful of sexual harassment complaints brought by female employees over a more than five-year stretch."[5]  Once Mr. Reid's actions began to receive more publicity, some artists that were involved with him voiced their opinions.  In an interview in 2017, TLC was asked about the allegations against Mr. Reid, who oversaw much of the group's early career.  As Rozonda "Chilli" Thomas buried her face in her hands, Tionne "T-Boz" Watkins, said she was not surprised by the accusations.[6]  Joe Budden, a rapper who was signed to one of the

_____

[4] *See* Joe Coscarelli and Melena Ryzik, *Music Mogul Russell Simmons Is Accused of Rape by 3 Women*, The New York Times (Dec. 13, 2017), https://www.nytimes.com/2017/12/13/arts/music/russell-simmons-rape.html.

[5] Claire Atkinson, *L.A. Reid May Have Settled Prior Sexual Harassment Claims*, N.Y. Post (May 16, 2017), https://nypost.com/2017/05/16/l-a-reid-may-have-settled-prior-sexual-harassment-claims/.

[6] Steven J. Horowitz, *TLC's Fierce Comeback: T-Boz and Chilli on Girl-Group Wokeness, L.A. Reid & Instagram Hustle*, Billboard (Jun. 22, 2017), https://www.billboard.com/music/features/tlc-2017-new-album-90s-tour-date-interview-7841104/.

labels Mr. Reid ran, called Mr. Reid a sexual predator and called out others in the industry who allowed Mr. Reid to continue his actions with no consequences.[7]

## H.  **Aftermath**

70.    After her experiences with Mr. Reid, Ms. Dixon gave up her career, abandoning not only her passion but over a decade of hard work spent learning a craft, building a network, and acquiring rare expertise that is not easily transferable to other industries.  Unable to bounce back from Mr. Reid's sexual assaults, harassment, and his consistent tethering of his sexual advances to professional obstacles that he placed in Ms. Dixon's path; Ms. Dixon became depressed and dejected, ultimately abandoning her professional passion and expertise.  She walked away from the decade she had devoted to refining her talent, which began with two internships right after college, followed by another job working as a receptionist, and then a job as a junior executive at a music publishing company, and finally culminated with her A&R roles at Def Jam and Arista.

71.    Despite Ms. Dixon's hard work, her vast creative and professional relationships, and the stellar reputation she had built, Mr. Reid made it impossible for Ms. Dixon to do her job as punishment for rejecting his advances.

72.    As a result, Ms. Dixon not only lost her career footing, but she also lost faith in herself.  Over time these experiences of abuse have erased her legacy and significance as a young woman who anticipated and impacted the massive potential of hip-hop.  When Mr. Reid took over as the head of Arista, Ms. Dixon had tremendous momentum and a blindingly bright future having dusted herself off following the events at Def Jam.  Unfortunately, Ms. Dixon ended up losing

---

[7] *Joe Budden Says LA Reid is a Sexual Predator*, WhatsHotHipHop (June 2017), http://whatshothiphop.com/joe-budden-says-la-reid-is-a-sexual-predator/.

everything she built, because Mr. Reid suffocated her career as punishment for her refusal to have a sexual relationship with him or allowing him to continue to assault her unfettered.

73.     Because Mr. Reid drove Ms. Dixon out of the music industry, we lost the ear that heard "Maria Maria" as a demo and brought it into Arista for Carlos Santana, that heard "My Love Is Your Love" as a demo and brought it into Arista for Whitney Houston, and that helped to shape Whitney Houston's "Heartbreak Hotel," "It's Not Right But It's Okay," who had a hand in "The Boy Is Mine" for Brandy and Monica, and who connected Pharrell with Prince for a remix of "The Greatest Romance Ever Sold," and who later paired Pharrell with Babyface for a brilliant single called "The Way She Moves."

74.     Because of Mr. Reid, we lost the talent that spotted then unknown artists Kanye West, John Legend, Toya, and Alice Smith.  We lost the woman whose idea gave us hip-hop's greatest love song, the Method Man and Mary J. Blige duet "I'll Be There for You" (All I Need to Get By).  We lost the ear and passion of the young woman who signed Brand Nubian for their reunion album and co-executive produced the critically acclaimed "Foundation" album.  We lost decades of Ms. Dixon's output and touch, and she lost decades of earning power, growth, personal fulfillment, and professional achievement.

75.     Ms. Dixon went into a severe depression for a time.  When she left the music industry, she continued therapy with various professionals to help treat her CPTSD and other issues associated with the trauma of her sexual assaults.

76.     These opportunities were taken not only because the trauma Ms. Dixon suffered drove her away from her dreams but because any comeback attempt inevitably comes into Mr. Reid's orbit.  Ms. Dixon's losses are profound; her lost profits from missed producer points alone are staggering.  A profession that involved daily listening sessions for Ms. Dixon and late nights

at studios all amounted to nothing.  Not because of her lack of skill, drive, or talent, but because L.A. Reid saw her as nothing more than an object to be used for sexual gratification with no regard for her intellect, mental health, or the immeasurable value she brought to the music industry and pop culture as a whole.  In fact, Mr. Reid used Ms. Dixon's immense love for the industry and her loyalty to the artists she signed against her, weaponizing her devotion to her career and her craft to exploit her body.

77.     Moreover, Mr. Reid's looming presence and power in the music industry affects Ms. Dixon in the present day.  As she attempts to participate in new dimensions of the industry such as the highly lucrative music royalty space where her combination of A&R chops and her Harvard MBA should make her a highly employable senior professional, Ms. Dixon has been told that although she is well-known, well-respected, and highly qualified, she is essentially blackballed because she has spoken out against Mr. Simmons and Mr. Reid.  Thus, the harm is ongoing and unceasing.

## NEW YORK ADULT SURVIVORS ACT

78.     This lawsuit is timely filed under New York's Adult Survivors Act (S.66A/A.648A), N.Y. C.P.L.R. § 214-j, which, beginning on November 24, 2022, created a one-year lookback window for the survivors of sexual assault that occurred when they were over the age of 18, allowing them to sue their abusers regardless of when the abuse occurred.  Based on the analogous Child Victims Act, N.Y. C.P.L.R. § 214-g, the ASA is a landmark piece of legislation for survivors of sexual abuse to file claims otherwise barred by the statute of limitations.  The actions described herein constitute sexual offenses by Mr. Reid under New York Penal Law Article 130 and were committed against Ms. Dixon when she was over the age eighteen years, for which she suffered physical, psychological, and other significant injuries as a result.

## COUNT I

### (Sexual Battery/Assault)

79.     Ms. Dixon repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

80.     Mr. Reid intentionally committed sexual battery/assault when he intentionally and forcibly touched and made bodily contact with Ms. Dixon by fondling her beneath her clothes and subjecting her to digital penetration of her vulva without her consent on two occasions, as described above.

81.     Mr. Reid's actions constitute sexual offenses as defined in New York Penal Law Article 130, including but not limited to aggravated sexual abuse, criminal sexual acts, forcible touching, sexual abuse, sexual assault, and sexual misconduct, inasmuch as Mr. Reid intentionally and forcibly digitally penetrated and touched sexual and intimate parts of Ms. Dixon's body for his own sexual gratification.  *See* N.Y. C.P.L.R. § 214-j; *see also, e.g.*, N.Y. Penal Law §§ 130.20, 130.40, 130.45, 130.50, 130.52, 130.53, 1130.55, 130.60, 130.65, 130.66, 130.67, 130.70.

82.     As a direct and proximate result of Mr. Reid's acts, Ms. Dixon has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## COUNT II

### (False Imprisonment)

83.     Ms. Dixon repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

84.     As a direct result of these allegations as stated, Mr. Reid falsely imprisoned Ms. Dixon on two occasions, as described above, for the purpose of degrading her, abusing her, and/or gratifying his sexual desires.

85.     As described above, on two separate occasions Mr. Reid intended to confine Ms. Dixon in his plane and in his car so that he could sexually abuse her.  Ms. Dixon was conscious of her confinement and did not consent to that confinement.

86.     As a direct and proximate result of Mr. Reid's acts, Ms. Dixon has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## COUNT III

### (Intentional Infliction of Emotional Distress)

87.     Ms. Dixon repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

88.     As a direct result of these allegations as stated, Mr. Reid committed intentional infliction of emotional distress against Ms. Dixon.

89.     Mr. Reid's actions, described above, constitute extreme and outrageous conduct that shocks the conscience.  Mr. Reid sexually assaulting Ms. Dixon on two occasions goes beyond all possible bounds of decency and is intolerable in a civilized community.

90.     Mr. Reid knew or disregarded the substantial likelihood that these actions would cause Ms. Dixon severe emotional distress.

91.     As a direct and proximate result of Mr. Reid's acts, Ms. Dixon has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## COUNT IV

## (Gender Motivated Violence Act, Administrative Code of City of N.Y. § 10–1101 *et seq.*)

92.     Ms. Dixon repeats and re-alleges the allegations stated above in paragraphs 1–78 as if fully set forth herein.

93.     The above-described conduct of Mr. Reid, including, but not limited to, Mr. Reid's sexual assaults and batteries of Ms. Dixon constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Dixon as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-903 (2017).

94.

95.     The above-described conduct of Mr. Reid, including, but not limited to, Mr. Reid's sexual assaults and batteries of Ms. Dixon, constitutes a "crime of violence" against Ms. Dixon motivated:  (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

96.     Mr. Reid committed a "crime of violence" against Ms. Dixon because she is a woman and, at least in part, because he has an unlawful animus towards women.  Mr. Reid's gender-motivated animus towards women is demonstrated by, among other things, his sexually abusive treatment of women.

97.     As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Dixon has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

98.     Mr. Reid's gender-motivated violence against Ms. Dixon entitles her to punitive damages and an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Dixon respectfully requests judgment against Mr. Reid, awarding compensatory, consequential, economic, exemplary, general and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Ms. Dixon demands a trial by jury on all claims so triable.


Dated:  November 8, 2023                              Respectfully submitted,


                                                     /s/ Kenya K. Davis

                                                     Kenya K. Davis (NY Bar #4162483)
                                                     Boies Schiller Flexner LLP
                                                     1401 New York Ave., NW
                                                     Washington, DC 20005
                                                     (202) 237-9608
                                                     kdavis@bsfllp.com

                                                     Sigrid S. McCawley (NY Bar # 6051460)
                                                     Daniel J. Crispino (*pro hac vice* pending)
                                                     BOIES SCHILLER FLEXNER LLP
                                                     401 E. Las Olas Blvd., Suite 1200
                                                     Fort Lauderdale, FL 33301

(954) 356-0011
smccawley@bsfllp.com
dcrispino@bsfllp.com

Valecia Battle (NY Bar #5716600)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-2391
vbattle@bsfllp.com