**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

DREW DIXON,

               Plaintiff,                                  Case No.:       1:23-cv-09878-JAV

v.

ANTONIO MARQUIS "L.A." REID,

               Defendant.

_____

**PLAINTIFF DREW DIXON'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' _DAUBERT_ MOTION TO EXCLUDE**
**THE EXPERT REPORTS OF MICHAEL SELVERNE AND MARC PLOTKIN**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES..................................................................................iii

MEMORANDUM OF LAW .................................................................................. 1

PRELIMINARY STATEMENT ..............................................................................1

FACTUAL BACKGROUND ...................................................................................2

MICHAEL SELVERNE'S REPORT......................................................................4

MARC PLOTKIN'S REPORT................................................................................5

ARGUMENT ............................................................................................................6

I.    THE EXPERTS ARE QUALIFIED....................................................... 7

      A.    Defendant Forfeited His Right to Challenge the Experts' Qualifications.............. 7

      B.    Michael Selverne Is Qualified to Testify on the Subject of A&R Executive Compensation and Plaintiff's Career Trajectory........................................ 8

      C.    Marc Plotkin Is Qualified to Testify on Plaintiff's Earnings Had Arista Signed Kanye West and John Legend .......................................... 10

II.   THIS COURT SHOULD NOT EXCLUDE MICHAEL SELVERNE'S REPORT AND TESTIMONY ................................................................ 12

      A.    Selverne's Opinions as to Plaintiff's Lost Income Are Based on Reliable Data and Reliable Methodology.................................... 12

            1.    Selverne's assumption that Plaintiff would have experienced continued success is warranted. ............................................. 13

            2.    Selverne's assumption the Plaintiff would have continued working as an A&R executive but for Defendant's conduct is warranted.................. 16

            3.    Selverne's assumption that Plaintiff would have achieved success on par with those of her successful contemporaries is warranted............. 17

      B.    Selverne's Opinions Will Assist the Jury and Not Usurp Their Role .................. 20

III.   THIS COURT SHOULD NOT EXCLUDE MARC PLOTKIN'S REPORT AND
       TESTIMONY ................................................................................................ 21

       A.   Plotkin's Opinions are Based on Reliable Data and Methodology........... 21

       B.   Plotkin's Opinions Will Assist the Jury and Not Usurp Their Role.......... 24

CONCLUSION.........................................................................................................24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*136 Field Point Circle Holding Co., LLC v Razinski, 21-CV-11076 (MMG)*,
   2025 WL 757558 (S.D.N.Y. Mar. 4, 2025) .............................................................. 13

*Actava TV, Inc. v Joint Stock Co. "Channel One Russia Worldwide"*,
   2023 WL 2529115 (S.D.N.Y. Mar. 15, 2023) .......................................................... 23

*Alla v. Verkay*,
   979 F.Supp.2d 349 (E.D.N.Y. 2013) ....................................................................... 15

*Allen v. City of New York*,
   466 F. Supp. 2d 545 (S.D.N.Y. 2006) ..................................................................... 21

*Arista Records LLC v Lime Group LLC*,
   2011 WL 1674796 (S.D.N.Y. May 2, 2011) .............................................................. 6

*Ashland Mgt. Inc. v Janien*,
   82 N.Y.2d 395 (N.Y. 1993) ....................................................................................... 1

*Barnett v. PA Consulting Grp., Inc.*,
   35 F.Supp.3d 11 (D.D.C. 2014) ......................................................................... 13, 14

*Bee v Novartis Pharm. Corp.*,
   18 F Supp 3d 268 (E.D.N.Y. 2014) ........................................................................ 21

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ........................................................................................ 14

*BS BIG V, LLC v Phila. Indem. Ins. Co.*,
   2022 WL 4181823 (S.D.N.Y. Sept. 13, 2022) ........................................................ 17

*Buckley v Reynolds Metals Co.*,
   690 F Supp 211 (S.D.N.Y. 1988) ........................................................................... 14

*Capri Sun GmbH v. Am. Beverage Corp.*,
   595 F. Supp. 3d 83 (S.D.N.Y. 2022) ...................................................................... 19

*City of Phila. v Bank of Am. Corp.*,
   2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023) ........................................................ 13

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ......................................................................................... passim

*Doe v. Trs. of Dartmouth Coll.*,
   699 F.Supp.3d 171 (D.N.H. 2023) ......................................................................... 19

*DoubleLine Cap. LP v Odebrecht Fin., Ltd.*,
    2024 WL 1115944 (S.D.N.Y. Mar. 14, 2024) ................................................ 1, 19

*Faulkner v. Arista Recs. LLC*,
    46 F.Supp.3d 365 (S.D.N.Y. 2014) ................................................................10, 11

*Feliciano v. CoreLogic Saferent, LLC*,
    2020 WL 6205689 (S.D.N.Y. June 11, 2020) ................................................ 6

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ................................................ 20

*Greene v. Northwell Health Inc.*,
    2024 WL 4287875 (E.D.N.Y. 2024) ................................................................ 7

*Gumbs v. Int'l Harvester, Inc.*,
    718 F.2d 88 (3d Cir. 1983) ................................................................................ 15

*Harrison v. Republic of Sudan*,
    838 F.3d 86 (2d Cir. 2016) ................................................................................ 7

*Hernandez v. M/V Rajaan*,
    841 F.2d 582 (5th Cir. 1988) ............................................................................ 15

*In re Air Crash Disaster at New Orleans, La.*,
    795 F.2d 1230 (5th Cir. 1986) ......................................................................... 15

*In re Demetriades*,
    58 F.4th 37 (2d Cir. 2023) ................................................................................ 7

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ................................................ 20

*In re Interest Rate Swaps Antitrust Litig.*,
    2023 WL 8675625 (S.D.N.Y. 2023) ................................................................ 19

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
    2008 WL 1971538 (S.D.N.Y. May 7, 2008) ................................................... 12

*Intl. Constr. Prods., LLC v Caterpillar, Inc.*,
    2024 WL 1494322 (D. Del Apr. 3, 2024) ........................................................ 8, 24

*Joy v. Bell Helicopter Textron, Inc.*,
    999 F.2d 549 (D.C. Cir. 1993) ......................................................................... 15

*King v. Wang*,
    2021 WL 5237195 (S.D.N.Y. 2021) ................................................................ 19

*Lyman v St. Jude Med. S.C., Inc.*,
  580 F Supp 2d 719 (E.D. Wis 2008) ................................................. 24

*Milward v. Acuity Specialty Prods. Grp.*,
  639 F.3d 11 (1st Cir. 2011) ............................................................ 7

*Molly C. v. Oxford Health Ins., Inc.*,
  2024 WL 4850813 (S.D.N.Y. 2024) ................................................ 19

*Montana Connection, Inc. v. Moore*,
  2015 WL 8055934 (M.D. Tenn. 2015) .............................................. 9

*Perez v. Progenics Pharm., Inc.*,
  204 F.Supp.3d 528 (S.D.N.Y. 2016) ................................................ 16

*Restivo v Hessemann*,
  846 F3d 547 (2d Cir. 2017) ........................................................... 21

*S & K Sales Co., v. Nike, Inc.*,
  816 F.2d 843 (2d Cir. 1987) ........................................................... 13

*Schwab v. Philip Morris USA, Inc.*,
  449 F.Supp.2d 992 (E.D.N.Y. 2006) ............................................... 23

*Serby v First Alert, Inc.*,
  2015 WL 4494827 (E.D.N.Y. July 22, 2015) ..................................... 6

*Sharp v. Ally Fin., Inc.*,
  328 F. Supp. 3d 81 (W.D.N.Y. 2018) ............................................... 7

*Shatkin v. McDonnell Douglas Corp.*,
  727 F.2d 202 (2d Cir. 1984) ........................................................... 15

*Simo v. Mitsubishi Motors N.A., Inc.*,
  245 F. App'x 295 (4th Cir. 2007) ...................................... 9, 15, 17, 18

*Sir Speedy, Inc. v. L & P Graphics, Inc.*,
  957 F.2d 1033 (2d Cir. 1992) ......................................................... 13

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  2024 WL 4246159 (S.D.N.Y. 2024) ................................................ 7

*TVT Recs. v. Island Def Jam Music Grp.*,
  279 F. Supp. 2d 366 (S.D.N.Y. 2003) .............................................. 22

*U.S. Info. Sys., Inc. v Intl. Broth. of Elec. Workers Local Union No. 3, AFL-CIO*,
  313 F Supp 2d 213 (S.D.N.Y. 2004) ............................................... 19

*United States v Barone*,
   2010 WL 2976502 (S.D.N.Y. July 14, 2010) .................................................... 6

*United States v Duncan*,
   42 F.3d 97 (2d Cir. 1994) ................................................................................ 24

*Whittlesey v. Union Carbide Corp.*,
   742 F.2d 724 (2d Cir. 1984) ............................................................................ 16

## **Rules**

Fed. R. Evid. 702 ................................................................................................ passim

## **Other Authorities**

RECORDING INDUSTRY ASSOCIATION OF AMERICA, "Gold & Platinum"
   https://www.riaa.com/gold-platinum/?tab_active=top_tallies&ttt=TAS#search_section .......... 4

The Music Industry: Economics, Marketing, and New Artist Development" Bakers
   Biographical Dictionary of Popular Musicians Since 1990 (Dale Music Press– 2003) ............. 9

## MEMORANDUM OF LAW

Plaintiff Drew Dixon submits this memorandum of law in support of her opposition to Defendant Antonio Marquis "L.A." Reid's motion to preclude the reports and testimony of Plaintiff's retained experts Michael Selverne and Marc Plotkin.

## PRELIMINARY STATEMENT

Plaintiff Drew Dixon retained two experts, Michael Selverne and Marc Plotkin, to calculate the lost commissions and career advancement she would have earned ████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████

Defendant takes issue with certain assumptions underlying both experts' reports. However, arguments that an expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony." *DoubleLine Cap. LP v Odebrecht Fin., Ltd.*, 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024) (citation omitted); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993) (noting that "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"). Moreover, each assumption that the experts rely on is reasonable, and has strong evidentiary support.

Defendant also faults the experts for not being able to predict with absolute certainty whether several facts would have occurred in the hypothetical world where Defendant did not sexually assault Plaintiff. But New York law acknowledges that some degree of uncertainty is inevitable in calculating lost income. *See e.g.,  Ashland Mgt. Inc. v Janien*, 82 N.Y.2d 395, 403 (N.Y. 1993) ("Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that

damages be capable of measurement based upon known reliable factors without undue speculation."). In sum, the lion's share of Defendant's arguments are premature, and only suitable for jury resolution. This Court should therefore deny Defendant's motion to exclude Michael Selverne's and Marc Plotkin's reports and testimony.

## **FACTUAL BACKGROUND**

Plaintiff Drew Dixon is a prolific and talented music producer, executive, and entrepreneur. Dkt. 1 ("Compl.") ¶¶ 1, 42, 44, 62. Her knack for listening to and analyzing music developed into skills that gave the world hits such as "American Boy" (Estelle featuring Kanye West), "My Love Is Your Love" (Whitney Houston), "Maria Maria" (Carlos Santana), and "A Rose Is Still a Rose" (Aretha Franklin featuring Lauryn Hill). *Id*. ¶1. At the outset of her career, while working at Zomba Recording Company, Plaintiff signed NAS and Erick Sermon. *See* Exhibit 1 (Report of Michael Selverne) at ¶25. At Def Jam, Plaintiff created the duet "You're All I need," performed by Method Man and Mary J. Blige, which earned Def Jam its first grammy, and became a Platinum record. *Id*. at ¶26. Finally, at Arista Records, Plaintiff introduced erstwhile CEO Clive Davis to stars like Lauryn Hill, Teddy Riley, Pharrell and Chad Hugo of The Neptunes, Q-Tip, J. Dilla, DJ Premiere, Matt Serletic and Wyclef Jean. *Id*. at ¶28. Each of these accomplishments prompted former Executive Vice President and Manager of Arista Roy Lott to dub Plaintiff a "budding superstar." *Id*. at ¶29.

Plaintiff's smooth and linear ascent was suddenly interrupted when Defendant replaced Clive Davis as CEO of Arista in 2000 and began sexualizing, abusing and harassing Plaintiff. Compl. ¶39. Indeed, even before Defendant's first day at Arista, he made sexually charged comments to Plaintiff after inviting Plaintiff apartment-hunting with him and his wife in New York. *Id*. at ¶¶ 40-41. Defendant's conduct escalated to outright sexual assault when Plaintiff was flying

with him in a private jet to a company-wide retreat in Puerto Rico in January 2001. *Id*. at ¶¶ 42-43. Following this assault, during the company retreat and back at home, Plaintiff made every effort to both avoid being alone with Defendant, while also trying to avoid drawing his ire. *Id*. at ¶¶ 44-46.

But Plaintiff's perilous balancing act failed. As a result of the first sexual assault—and noticing that Plaintiff was avoiding him—Defendant began trying to sabotage Plaintiff's career by embarrassing her in front of colleagues and otherwise being rude and unprofessional. *Id*. at ¶47. Plaintiff was of course justified in her belief that she was still not safe near Defendant, as the next time she found herself alone with him, in a car ride after a work event later in 2001, Defendant sexually assaulted her once again. *Id*. at ¶¶ 48-51. Not satisfied with twice physically violating her, and as a direct consequence of that abuse, Defendant continued retaliating against Plaintiff for resisting the assaults and rejecting his repeated requests to join him alone at the Four Seasons Hotel, and for letting his torrents of late-night phone calls go to voicemail. *Id*. at ¶53. But for the assaults Ms. Dixon would have worked late and in close proximity with Mr. Reid just as she had with Clive Davis in his office and at his residence.

Spurned and vengeful, Defendant continued his campaign to destroy Plaintiff's career, going so far as to sabotage her ability to capitalize on promising, and ultimately billboard-chart-topping artists that Plaintiff presented to Arista. For instance, when Plaintiff and another colleague in the A&R department brought Kanye West in for an audition, Defendant not only passed on the rapper but berated Plaintiff in front of the whole A&R department while Kanye waited in the lobby. *Id*. at ¶55. A few months later, Plaintiff tried to get Arista to sign John Legend (then John Stephens), who went on to become an Emmy, Grammy, Oscar and Tony (EGOT) winner. *Id*. at ¶56. But even after paying to rent a private rehearsal space for Legend to audition, Defendant—after Plaintiff

once again turned down his request to join him at his hotel room, refusing to consent to continuing abuse—cancelled the entire audition and ordered Arista's senior staff not to attend, leaving Plaintiff alone to watch Legend and his band perform. *Id*.

These vindictive and commercially irrational actions sparked in Plaintiff the realization that Defendant would stop at nothing to stifle her professional growth and prospects. *Id*. at ¶57. Demoralized and disheartened, Plaintiff left Arista to pursue an MBA at Harvard Business School in 2002, giving up on her dream of starting a label. *Id*. In 2004, after she graduated from Harvard with honors, Plaintiff briefly returned to the music industry, becoming General Manager of John Legend's Homeschool Records. *Id*. at ¶59. However, Plaintiff's comeback was short-lived, as the consistent reminders of her humiliating experience with Defendant and Russell Simmons—and her fear and distress over the prospect of encountering those two or their colleagues—triggered depression and drove Plaintiff away from music once again. *Id*.

While she was shut out of the industry, John Legend became an EGOT winner, *id*. at ¶56, and Kanye West became the fourth-highest certified artist in the U.S. by digital singles. *See* RECORDING INDUSTRY ASSOCIATION OF AMERICA, "Gold & Platinum" https://www.riaa.com/gold-platinum/?tab_active=top_tallies&ttt=TAS#search_section.    Plaintiff has been deprived of professional feats and monetary gains as a direct result of the sexual abuse Defendant inflicted on her. Plaintiff's experts, who are highly qualified in their field, properly quantified Plaintiff's losses and Defendant's Daubert challenge should be flatly rejected.

## MICHAEL SELVERNE'S REPORT

**MARC PLOTKIN'S REPORT**

██████████████████████████████████████

███████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

## ARGUMENT

In ruling on *Daubert* motions, the inquiry of district courts' "focuses on three issues: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Arista Records LLC v Lime Group LLC*, 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011). "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Serby v First Alert, Inc.*, 2015 WL 4494827, at *1 (E.D.N.Y. July 22, 2015). Exclusion remains "the exception rather than the rule." *Feliciano v. CoreLogic Saferent, LLC*, 2020 WL 6205689, at *1 (S.D.N.Y. June 11, 2020). Due to this liberal standard of admissibility, courts err on the side of permitting expert testimony and allowing it to be contested through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *United States v Barone*, 2010 WL 2976502, at *1 (S.D.N.Y. July 14, 2010) ("*Daubert* reinforces the idea that

there should be a presumption of admissibility of evidence") (citation omitted); *Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 15 (1st Cir. 2011) ("[C]ourts must stop short of weighing the evidence … So long as an expert's … testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process.") (internal citations and quotations omitted). Both Michael Selverne and Marc Plotkin are qualified, and their expert reports and testimony are based on reliable data and methodology; they therefore both easily surpass *Daubert*'s liberal standard of admissibility.

## I.    THE EXPERTS ARE QUALIFIED

### A.    Defendant Forfeited His Right to Challenge the Experts' Qualifications

While Defendant asserts that he "does not concede" that "Selverne and Plotkin are qualified to testify as experts," Dkt. 125 Memorandum of Law in Support of Motion to Exclude ("Br.") at 12, in his opening brief he makes no argument whatsoever that they are not qualified. "Where a party refers to an issue in only 'a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived[ ]—or, more precisely, *forfeited.*'" *Greene v. Northwell Health Inc.*, 2024 WL 4287875, at *17 (E.D.N.Y. 2024) (emphasis in original) (citing *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023)); *Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 105 (W.D.N.Y. 2018) ("[N]ew arguments raised in successive briefing papers will not be considered where those arguments could have been raised in a previous submission.") (collecting cases).

Here, Defendant had the opportunity to argue that either Selverne or Plotkin were not qualified; he elected not to. This Court should therefore deem any such argument forfeited and not allow Defendant to advance it in his reply papers. *See Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016) (argument waived when first raised in reply papers at trial level); *see also Sjunde AP-Fonden v. Gen. Elec. Co.*, 2024 WL 4246159, at *4 (S.D.N.Y. 2024) (granting the defendant's motion in limine where the "[p]laintiffs ma[de] no substantive argument in opposition to the

motion and, thus . . . forfeited any such argument."); *Intl. Constr. Prods., LLC v Caterpillar, Inc.*, 2024 WL 1494322, at *1 (D Del Apr. 3, 2024) (holding that where party raised arguments in "reply brief" in support of Daubert motion that were "mostly different [from] the arguments [included] in the opening brief," the party "forfeited" newly-inserted arguments). However, even if this Court does not deem the expert-qualification argument forfeited, both Selverne and Plotkin are eminently qualified.

### B.    Michael Selverne Is Qualified to Testify on the Subject of A&R Executive Compensation and Plaintiff's Career Trajectory

After graduating from Brandeis in 1981, and New York Law School in 1984, Michael Selverne immediately soared within the fields of music and music law. Ex. 1 ¶13. In 1985, he founded and became managing partner of Selverne & Flam (now Selverne Bradford PLLC), a boutique law firm specializing in advising clients in the music industry. *Id*. at ¶5. In the early stages of his career, Selverne represented prominent jazz artists like Michael Brecker, John Scofield and Mike Stern. *Id*. As his practice grew, Selverne served as the principal business advisor for clients such as Motley Crue, the Fugees, India and Arie. *Id*.

In the late 1980s, Selverne was engaged by various record and publishing executives to guide them in contract negotiations with employees, especially negotiations over executive compensation packages. *Id*. at ¶6. In 1993, Selverne was appointed lead music and business counsel for Notation Music group, where he was likewise responsible for negotiating and structuring executive compensation, until the company was sold in 2005. *Id*. at ¶8.

Largely during this same period, Selverne served as general counsel and head of business affairs for Songs Music Publishing, where he also oversaw negotiations with employees and structuring executive compensation packages. *Id*. at ¶9. He had yet another position between 2002 and 2022 representing Kobalt Music Company—the fourth largest music publisher in the country,

according to Billboard Magazine—and advising its CEO on the company's business affairs. *Id*. at ¶10. Selverne currently serves as general counsel for Round Hill Music Partners, where he also oversees employee negotiation and executive compensation. *Id*. at ¶11.

Throughout his storied career, Selverne has been consistently recognized for professional competence and integrity by industry peers. He was named a Billboard Music Lawyer each of the past six years, and he has been AV rated by Martindale Hubbell for the past twenty-five years. *Id*. at ¶13. He has lectured at numerous colleges, law schools and professional panels on music law, enterprise and record production. *Id*. He is a former faculty member of the Practicing Law Institute, a contributor to the Negotiating Contracts in the Entertainment Industry handbook and course series, and an author of an essay on artist development. *Id*. at ¶13-14.[1]

Courts accept expert testimony from experts, like Selverne, whose knowledge comes from "personal observations" of individuals within an industry, and who "evaluate" those industry actors and "determine their value" based on those personal observations. *Simo v. Mitsubishi Motors N.A., Inc.*, 245 F. App'x 295, 301 (4th Cir. 2007) (affirming denial of Daubert Motion where expert sports agent was capable of "reliably estimat[ing] soccer players' value "by [] personal observations and experience of a person whose job requires him to evaluate players' abilities and determine their value"). This is equally so when an expert's specialized knowledge stems from personal observations of the "customs and practices" of the music industry—particularly the payment structures and potential earnings of various industry actors—based on extensive experience in that industry. *See Montana Connection, Inc. v. Moore*, 2015 WL 8055934, at *9 (M.D. Tenn. 2015) ("The Court concludes that [the expert] is qualified to offer an expert opinion

---

[1] "The Music Industry: Economics, Marketing, and New Artist Development" Bakers Biographical Dictionary of Popular Musicians Since 1990 (Dale Music Press– 2003).

on the customs and practices of the music industry and his testimony would be relevant in helping the trier of fact understand the parties' roles and their industry activities and the income streams from which artists make their money.").

Given his long career, and intimate familiarity with the practices and customs of A&R executives and record labels, Selverne is uniquely qualified to testify on A&R executive compensation and Plaintiff's career trajectory had she not been sexually assaulted by Defendant. *See Faulkner v. Arista Recs. LLC*, 46 F.Supp.3d 365, 380 (S.D.N.Y. 2014) (holding that expert was "qualified to testify about the status of Arista's records, the minimum royalties owed estimate, and the release-based royalties estimate" in part because he had "conducted or supervised thousands of royalty examinations," and because "[t]he subject matter of [the expert's] proposed testimony [wa]s the amount of royalties owed Plaintiffs").

### C.    Marc Plotkin Is Qualified to Testify on Plaintiff's Earnings Had Arista Signed Kanye West and John Legend

An American Songwriting Award-winning artist, Grammy-shortlisted producer, Bloomberg BusinessWeek Top 25 Entrepreneur, and Professor at New York University's Clive Davis Institute of Recorded Music, Marc Plotkin has over two decades of experience in the music industry. Ex. 2 at 75.

After receiving a Bachelor of Arts degree from a joint program between Case Western Reserve University and The Cleveland Institute of Music, Plotkin founded Wifi Music School, an online marketplace offering private music lessons via Skype. *Id*. Currently, as Founder and CEO of Beast Music A.I., he leads an advanced artificial intelligence platform for music marketing. *Id*. The platform is utilized by major record labels such as RCA Records and Atlantic Records, to accurately predict and enhance music earnings and financial returns. *Id*. Under Plotkin's leadership, Beast Music A.I. has enabled multiple songs to reach the Billboard charts. *Id*.

10

Plotkin has also collaborated with a diverse array of celebrated artists, including Jon Batiste, Sufjan Stevens, Ra Ra Riot, Panama Wedding, Pete Francis of Dispatch, Hiromi, and Peter Himmelman. *Id*. His song "Smokescreen" won an American Songwriting Award, and his production of Rebecca Brandt's album "Numbers & Shapes" was shortlisted for a Grammy Award. *Id*.

In his role as Area Head of Business and Technology at NYU's Clive Davis Institute of Recorded Music—consistently ranked as the top music business program globally by publications like Billboard and Rolling Stone—Plotkin teaches courses that merge music creation with entrepreneurship and business strategy. *Id*. He has likewise hosted a series featuring influential leaders from the music, technology, and business sectors, including Jack Dorsey (co-founder of Twitter & Square), Scooter Braun (manager to Justin Bieber and Ariana Grande), Ryan Holiday (best-selling author), members of Vulfpeck, Rostam Batmanglij (Vampire Weekend), Rob Moose (Bon Iver), Merck Mercuriadis (Hipgnosis Songs Fund), and Jack Conte (Patreon). *Id*.

Plotkin is also a member of the Recording Academy and has been featured in interviews on the music business with NBC News, The Times of London, The Washington Post, The Wall Street Journal, and others. *Id*. He has guest-lectured at Johns Hopkins University, various music festivals across Europe, Carnegie Hall, and other prestigious venues. *Id*. In sum, Plotkin's qualifications to testify on Plaintiff's lost commissions are unimpeachable. *See Faulkner v Arista Recs. LLC*, 46 F Supp 3d 365, 380 (S.D.N.Y. 2014) (expert was qualified to testify as to amount of royalties allegedly owed to former band members where the expert had "performed royalty examinations in the music industry for forty years").

## II.    THIS COURT SHOULD NOT EXCLUDE MICHAEL SELVERNE'S REPORT AND TESTIMONY

Michael Selverne's expert report and testimony meet the reliability prong under Rule 702 and *Daubert*. In cases where experts "draw a conclusion from a set of observations based on extensive and specialized experience," "the method is the application of experience to facts." *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008). Here, Selverne's extensive experience in the music industry working with artists and A&R executives forms a sufficient foundation of personal observations upon which to form a reliable methodology of assessing the value and potential of those same artists and A&R executives, and his study of Plaintiff's early career, the Arista employment contracts and Plaintiff's Arista contemporaries form a sufficient dataset to enable him to reach his conclusions.

### A.    Selverne's Opinions as to Plaintiff's Lost Income Are Based on Reliable Data and Reliable Methodology

However, as explained below, arguments that an expert's assumptions are unwarranted go to evidentiary weight and not admissibility, and each of these assumptions is reasonable and supported by the factual record.

12

Certain baseline assumptions are inevitable when an expert projects a party's income. Thus, under New York law "[l]ost profits, though typically difficult to prove with exactitude, may be recovered to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty . . . The fact that the precise amount of damage may be difficult to ascertain is not fatal to the claim, and doubts are generally resolved against the party in breach." *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038 (2d Cir. 1992); *see also S & K Sales Co., v. Nike, Inc.,* 816 F.2d 843, 852 (2d Cir. 1987) (noting that a plaintiff "need only provide the jury with a sound basis for approximating with reasonable certainty the profits lost").

"[C]ontentions that [] assumptions are unfounded go to the weight, not the admissibility, of the testimony." *City of Phila. v Bank of Am. Corp.*, 2023 WL 6160534, at *5 (S.D.N.Y. Sept. 21, 2023) (citation omitted); *see also 136 Field Point Circle Holding Co., LLC v Razinski*, 2025 WL 757558, at *16 (S.D.N.Y. Mar. 4, 2025) (same) (citation omitted); *Barnett v. PA Consulting Grp., Inc.*, 35 F.Supp.3d 11 (D.D.C. 2014)) (holding that where party did "not challenge the methodology" employed by the expert, but rather the "assumptions" the expert "made in his analysis," this was "not a sufficient basis on which to prohibit [the expert's] testimony. [Because a]s the Supreme Court aptly stated in *Daubert*, 'vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)). Thus, while Defendant's attacks on the "assumptions" underlying Selverne's report is fodder for cross-examination, it is not a basis to exclude his report or testimony.

### 1.    Selverne's assumption that Plaintiff would have experienced continued success is warranted

Plaintiff was a prolific success early in her career. As noted in Selverne's report, while working at Zomba, Plaintiff signed NAS and Erick Sermon. Ex 1. at ¶25. At Def Jam Plaintiff

created the grammy-winning-and-Platinum-record duet "You're All I need," performed by Method Man and Mary J. Blige. *Id*. at ¶26. Finally, at Arista, Plaintiff introduced Clive Davis to stars like Lauryn Hill, Teddy Riley, Pharrell and Chad Hugo of The Neptunes, Q-Tip, J. Dilla, DJ Premiere, Matt Serletic and Wyclef Jean, *id*. at ¶28, prompting colleague Roy Lott to dub Plaintiff a "budding superstar." *Id*. at ¶29.

This early pattern of success provides a firm basis to project that Plaintiff would have maintained that trajectory and continued receiving promotions and bonuses throughout her career. *See e.g.*, *cf. Buckley v Reynolds Metals Co.*, 690 F Supp 211, 217 (S.D.N.Y. 1988) ("When calculating lost earnings, it is correct to include any pattern of increases in plaintiff[s'] pre-discharge earnings."); *Barnett v. PA Consulting Grp., Inc.*, 35 F. Supp. 3d 11, 18 (D.D.C. 2014) (denying *Daubert* Motion where expert projected that terminated consultant would have been promoted to partner and received partner-level compensation, even when the party opposing admission claimed that the expert report failed to account for the consultant's "dramatically sub-par financial performance" at the firm).

For the same reason, Plaintiff's early successes distinguish this case from those where lost income projections are "based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). In *Boucher*, cited by Defendant, Br. at 13, the expert's lost-earnings testimony was "based on assumptions about [the plaintiff's] employment prospects that represent[ed] a complete break with his work history of seasonal and intermittent employment," even where there was "nothing of probative value—such as a change in family responsibilities, or the acquisition of a new set of skills—[that] account[ed] for the reversal assumed by the expert." *Id*. at 22. By contrast, Selverne's

report assumes no abrupt and inexplicable reversal, but rather a continued trajectory of linear success based on an early record of Plaintiff's outstanding achievements.[2]

And this continued trajectory throughout Plaintiff's career is not made less likely by the fact that "there are relatively few people [who achieve] . . . repeated success and longevity as A&R executives." Br. at 15 (citing Ex. 1 ¶16). Again, Plaintiff's impressive early career feats furnish strong evidence that she would have been one of the "relatively few" to obtain such durable success. Plus, courts permit expert testimony of lost earnings in fields where success is rare, so long as there is foundation for the projection. *See Simo v. Mitsubishi Motors N.A., Inc.*,

---

[2] The other authorities relied on by Defendant, Br. at 13, 14 n.1, are likewise wholly inapposite. In *Alla v. Verkay*, 979 F.Supp.2d 349, 375-76 (E.D.N.Y. 2013), the expert opined that the plaintiff "would never be able to work again," a conclusion contradicted by record evidence and other expert testimony. In *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984), the expert calculated that a decedent son would contribute "20% of his disposable income to his mother" based on statistics that "the average head of a household spends 20% of his income on himself," even though record evidence showed that, prior to his death, the decedent only assigned to his mother a "$96.01 monthly annuity." In *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983) the expert calculated the plaintiff's future loss based on his remaining life expectancy, rather than his "remaining work-life expectancy," and layered on projected fringe benefits that the plaintiff had never received before. The expert in *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568 (D.C. Cir. 1993) speculated that a helicopter crash victim would have changed careers (from toy store operator to consultant), and that his real estate investments would have appreciated at "a rate of 11 percent a year for the remainder of [his] life." In *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) the expert projected that the plaintiff, who had been a "part-time longshoreman for the three years preceding his injury," would have received the "average full-time [U.S.] longshoreman's rate," adjusted "upward to account for seniority . . . and fringe benefits," even though "[n]o evidence support[ed]" the idea that the plaintiff would begin working full-time, would have achieved seniority, or had ever received fringe benefits before. Finally, *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1234 (5th Cir. 1986) involved an economist's "incredible" assumption that the decedent's salary would have "increase[d] by 8%, in real terms, every year until the year 2021," and his assumption that the decedent would have continued paying an "artificially low tax rate" of 5% throughout his career. Here, by contrast, the experts' reports: have evidentiary support; are not tied to statistical averages untethered to Plaintiff's circumstances and behavior; do not project abrupt career changes, shifts to full-time employment, or "incredible" tax benefits or financial and real estate investment returns; and do not predict newly acquired fringe benefits out of line with the industry or prior employment history.

245 F. App'x 295, 301, 300 (4th Cir. 2007) (declining to exclude expert's projections of car-accident-victim-college-soccer-player's "career path," in face of argument that player's "prospects for future success were 'simply unknown and unknowable,'" in part because the expert based his projections on the soccer player's desire "to pursue his soccer career in Europe," and the expert's own "specialized knowledge of the earning opportunities" there).

### 2.    Selverne's assumption the Plaintiff would have continued working as an A&R executive but for Defendant's conduct is warranted

████████████████████████████████████████████████████████████

██████████████████████████████████ First, in the second circuit there is a presumption, "'absent evidence to the contrary, that [an] illegally discharged employee would have continued working for the employer until . . . she reached normal retirement age.'" *Perez v. Progenics Pharm., Inc.*, 204 F.Supp.3d 528, 551 (S.D.N.Y. 2016) (as to front pay awards) (quoting *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727 (2d Cir. 1984)). At a minimum, Plaintiff's early record of success provides ample evidence that she would have had the incentive to remain in the industry were it not for Defendant's conduct. Moreover, it is unlikely that Plaintiff would have left the industry to attend Harvard Business School absent Defendant's conduct, since she made the decision to attend after Defendant began sexually abusing and harassing her. *See* Compl. ¶57.

Defendant observes that Plaintiff "momentarily" "returned to the music industry in 2004" to work at John Legend's music label before "voluntarily le[aving] even in the midst of having success with an artist named Estelle." Br. at 17 (citing Compl. ¶¶58-59]). However, Plaintiff left the industry in 2004 "out of an apprehension of having to encounter [Russell] Simmons, [Defendant L.A.] Reid, and/or people that worked for them," Br. at 7 (citing Compl. ¶¶58-59), an apprehension directly stemming from the emotional distress she suffered as a result of Defendant's conduct. Defendant may contest this explanation and propose other causes for Plaintiff's career

being short circuited, but such challenges are fodder for cross examination, not exclusion. *See e.g.*, *BS BIG V, LLC v Phila. Indem. Ins. Co.*, 2022 WL 4181823, at *4 (S.D.N.Y. Sept. 13, 2022) ("[C]ontentions that [] assumptions are unfounded go to the weight, not the admissibility, of [] testimony.") (citation omitted).

> ### 3.    Selverne's assumption that Plaintiff would have achieved success on par with those of her successful contemporaries is warranted

████████████████████████████████████████████

████████████████████████████████████████████ Br. at 14.

Defendant takes issue with Selverne's use of comparators (contemporaries of Plaintiff at Arista who thrived and went on "to head record labels and joint ventures," Ex. 1. at ¶¶53-59) and argues that the fact that "a few people have reached the pinnacles of success is not a reliable predictor that [Plaintiff] would have," especially when "'relatively few people' achieve lasting success as A&R executives." Br. at 16.

But the use of similarly situated comparators to assist with the projection of lost earnings is a well-established method, even in fields where relatively few achieve success. *See e.g.*, *Simo v. Mitsubishi Motors N.A., Inc.*, 245 F. App'x 295, 300 (4th Cir. 2007) (permitting expert testimony where expert projected lost earnings of college soccer player, based on the expert's "own evaluation of [the player's] abilities," the evaluations of others "involved with the sport who believed that [the soccer player] 'was destined to become one of the top American players of his generation' before his accident," and the expert's "comparison" with "the salaries of eight then-current or former left-footed players from the American Senior National Team."). The examples of Plaintiff's contemporaries, coupled with evidence of Plaintiff's own early career triumphs, thus

serves as a strong and reliable predictor that Plaintiff would have reached the pinnacle of the A&R industry.[3]

For this same reason, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Several of Plaintiff's contemporaries highlighted by Selverne attained these positions.

For instance: ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ As *Simo* makes clear, it is permissible for an expert to

1) take evidence of a plaintiff's early success; 2) compare the plaintiff to similarly situated peers

and their later career accomplishments; and 3) predict that the plaintiff would have had similar

accomplishments and obtained similar positions had her career not been derailed. Defendant's

position that this method is not "reasoned" is unsupported by the law.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ However, arguments regarding an expert's

use of imperfect data, or a supposedly "small sample size go[] to the weight rather than to the

---

[3] Defendant's analogy to a prediction that "every junior senator in Congress will one day be President of the United States," Br. at 17, is inapt. First, the odds are far better for junior A&R executives to reach the heights of their industry, as there are a larger number of spots at the top. Second, there is evidence here of potential to ascend to the heights of the profession, which is not the case with any given junior senator.

reliability (and admissibility) of a[n expert report]." *U.S. Info. Sys., Inc. v Intl. Broth. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F Supp 2d 213, 232 (S.D.N.Y. 2004); *see also Molly C. v. Oxford Health Ins., Inc.*, 2024 WL 4850813, at *12 (S.D.N.Y. 2024) ("Imperfect data . . . goes to the weight of the expert's opinion, not its admissibility, and is not grounds for exclusion."); *In re Interest Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *4 (S.D.N.Y. 2023) (noting that "[t]he question for *Daubert* purposes is not whether the expert employed the best possible input data to form her testimony, but whether 'the testimony is based on sufficient facts or data.'") (citing Fed. R. Evid. 702); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 2024 WL 1115944, at *11 (S.D.N.Y. Mar. 14, 2024) ("[W]hen constructing a study, researchers "necessarily rely on their discretion, to some degree," to determine what data "meets their selection criteria"); *King v. Wang*, 2021 WL 5237195, at *15 (S.D.N.Y. 2021) (admitting portions of art appraisal, even though expert's conclusions were based on "very few comparables" and on "information from Mainland Chinese auction houses," which are "frequently [] unreliable").[4]

████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████, rendering industry-wide surveys logistically infeasible. What is more, industry-wide surveys may be less edifying than comparing Plaintiff to similarly situated A&R executives at Arista, as music industry

---

[4] *See also Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 135 (S.D.N.Y. 2022) (cleaned up) (declining to exclude expert opinion "for relying on unverified revenue figures as part of his analysis, for cherry-picking among sales data, and for underlying limited verification of data," because "the asserted divots in [the expert's] data and approach [we]re best left for adversarial testing at trial."); *Doe v. Trs. of Dartmouth Coll.*, 699 F.Supp.3d 171, 178 (D.N.H. 2023) (denying *Daubert* motion where proponent's "arguments [went] not so much to the reliability of [the expert's] methodology, but to the factual inputs she did or did include in conducting her analysis," because "contentions" that the expert should have considered other factual inputs was "fodder for cross-examination, not for exclusion of [the expert's] testimony.").

practices and customs vary dramatically across different record labels and different time periods. Use of within-company comparators is therefore not "cherry-pick[ing]," Br. at 17, but a potentially more accurate barometer of lost earnings.

### B.    Selverne's Opinions Will Assist the Jury and Not Usurp Their Role

Selverne's opinions will also assist the jury under Rule 702 and *Daubert*. The requirement that expert testimony "assist the trier of fact" goes primarily to relevance. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (referring to this prong as the "helpfulness" standard). Relevance can be expressed as a question of "fit"—"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* Here, Selverne's opinions are relevant and sufficiently tied to the facts of the case because they aid the jury in having proper context to weigh the evidence. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 4251229, at *4 (S.D.N.Y. Feb. 19, 2020) (denying in part *Daubert* motion where the expert's testimony "provid[ed] the trier of fact with the necessary tool[s] to make [the] ultimate determination").

Defendant claims that Selverne's report will not assist the jury because "he is merely rendering an opinion as to what success would have looked like assuming Dixon go there," not "whether" that success "would have occurred." Br. at 18. But this is not accurate, ███████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ His testimony is not rendered a "truism," Br. at 18, because it fails to opine on whether various events would have occurred in the "but-for world" where Defendant did not sexually assault Plaintiff and drive her out of the music industry. *See cf. In re Elec. Books Antitrust Litig.*, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ("It is unsurprising that [the expert] did not develop an opinion about

many of the issues that Apple contends are important features of a but-for world. After all, the but-for world does not exist.").

Selverne's opinions also do not usurp the role of the Court or the jury. The Report provides background on the contracts and payment structure for A&R executives, but "[t]his is not a case . . . where 'the witness repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms.'" *Allen v. City of New York*, 466 F. Supp. 2d 545, 549 (S.D.N.Y. 2006). Selverne does not offer his opinion as to whether Defendant has violated any statute or rules. Therefore, Selverne's report will assist the jury in evaluating the weight of the evidence at trial and will not usurp its role.

## III. THIS COURT SHOULD NOT EXCLUDE MARC PLOTKIN'S REPORT AND TESTIMONY

### A. Plotkin's Opinions are Based on Reliable Data and Methodology

This Court should not exclude Marc Plotkin's report and testimony. As noted, "under Rule 702, the district court must [determine] . . . whether the [expert] opinion is based upon reliable data and methodology." *Bee v Novartis Pharm. Corp.*, 18 F Supp 3d 268, 300 (E.D.N.Y. 2014). In attacking the data and methodology of Plotkin's report, Defendant again arrays several challenges to supposedly "speculative" assumptions that the report relies on. *See* Br. at 19. Yet, as with Selverne's report, Defendant's challenges to the assumptions Plotkin relies on go to weight and not admissibility. *See e.g.*, *Restivo v Hessemann*, 846 F3d 547, 577 (2d Cir. 2017). Moreover, each of the assumptions that Plotkin relies on is entirely justified considering evidence in the record.

First, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ But Defendant ignores Plaintiff's excellent working relationship with both artists, which endured even after Defendant drove Plaintiff from Arista in

2002, as evidenced by Plaintiff's being invited by John Legend to head his record label in 2004, Compl. ¶59, and by Plaintiff advising Kanye West to feature on "American Boy" and arranging for him to record his vocals for that song at Platinum Sound during that same year. Compl. ¶58.

Second, ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████ However, it is for the jury to assess the extent to which this other A&R executive was responsible for the presentation of Mr. West to Arista. More pointedly, however, this argument itself rests on an assumption that Defendant would have arbitrarily exercised his contractual discretion to assign the "Designated Artist" rights exclusively to this unidentified executive and deprive Plaintiff of any of the commissions connected to Mr. West's album sales, despite Plaintiff's uncontested contribution to the effort to present Mr. West to Arista. Such an arbitrary executive maneuver could only be explicable as a component of a campaign of retaliatory behavior by Defendant against Plaintiff as a result of his sexual abuse and for rejecting Defendant's sexual advances.

Third, Defendant asserts that ████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████ Br. at 20. ███████████████

███████████████████████████████████████████████████████████████

██████ this Court has held that questions regarding whether one record label deprived of an artist's sales would have been as successful as another label that the artist actually signed with go to "evidentiary weight, not sufficiency." *TVT Recs. v. Island Def Jam Music Grp.*, 279 F. Supp. 2d 366, 387 (S.D.N.Y. 2003) ("IDJ disputes the jury's award on the basis that TVT's experts did not

consider competition in the marketplace that would be present in a November 2002 release; that TVT has never marketed a hip hop album that sold two million units; that [the artists'] prior successes were marketed by IDJ's affiliates and not by TVT; and that TVT's experts did not have specialized expertise in hip hop music. *Each of these arguments addresses evidentiary weight, not sufficiency, and is therefore beyond the purview of the Court's present analysis.*") (emphasis added).

Fourth, █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ *See generally* Ex. 2. That an expert's model is capable of accounting for a range of possible outcomes is a point in its favor, not somehow a ground for exclusion. *See e.g.*, *cf. Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992, 1166 (E.D.N.Y. 2006) (holding that expert would be permitted to testify in civil RICO class action even though the expert did not calculate number of persons who actually relied on the defendant manufacturers' representations, but instead assumed reliance by every class member, because the "model c[ould] be adjusted according to the jury's finding on the percent of the class that relied on the alleged fraud") (abrogated on other grounds).[5]

---

[5] Defendant likewise faults Plotkin for not "review[ing] or analyz[ing] any evidence, or tak[ing] any action, to try to determine if there was a factual basis for the assumption that [Plaintiff would have signed the artists and/or stayed at Arista," Br. at 20 n.3, and appears to argue that the data Plotkin relied on was insufficient for this reason. But Plotkin was tasked specifically with ███████████████████████████████████████████████████████████████████████████ ████████████████████████████ It was permissible for Plotkin to limit his report and investigation to issues within his assigned remit, and his reliance on the above assumptions goes to weight, and not admissibility. *See e.g.*, *cf. Actava TV, Inc. v Joint Stock Co. "Channel One Russia*

### B.    Plotkin's Opinions Will Assist the Jury and Not Usurp Their Role

Defendant neither argues that Plotkin's report will not assist the jury nor argues that it will usurp its role, and he has therefore forfeited this argument. *See Int'l. Constr. Prods., LLC v Caterpillar, Inc.*, 2024 WL 1494322, at *1 (D. Del Apr. 3, 2024); *supra* at I.a. And for good reason too, as there "is no question" that Plotkin's report, which estimates Plaintiff's damages in connection with her lost commissions from Kanye West and John Legend's album sales, will assist the jury in quantifying her damages. *Lyman v St. Jude Med. S.C., Inc.*, 580 F Supp 2d 719, 724 (E.D. Wis 2008) (holding that where expert provided "five different models to assist the jury in its damages projections" there was "no question that [the expert's] testimony [would] assist the jury in its calculation of damages"). Similarly, there is no colorable argument that Plotkin's report would usurp the jury's role, as his report does not use any legal language or opine as to whether Defendant violated any statute or legal standard. Instead, he only opined as to the scope of a specific category of Plaintiff's damages. *See United States v Duncan*, 42 F.3d 97, 103 (2d Cir. 1994) (expert opinion did not usurp the role of the jury where the expert opined on a "factual" question).

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to exclude Michael Selverne's and Marc Plotkin's reports and testimony.

Dated: June 13, 2025

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

*/s/ Kenya K. Davis*

---

*Worldwide"*, 2023 WL 2529115, at *6 (S.D.N.Y. Mar. 15, 2023) ("As an expert on damages, Dr. Kerr can assume a finding of liability.").

Kenya K. Davis (NY Bar #4162483)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-9608
kdavis@bsfllp.com

Sigrid S. McCawley (NY Bar # 6051460)
Daniel J. Crispino (*pro hac vice*)
Amber Stewart (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
smccawley@bsfllp.com
dcrispino@bsfllp.com
astewart@bsfllp.com

*Counsel for Plaintiff Drew Dixon*

## <u>CERTIFICATE OF COMPLIANCE (LOCAL RULE 7.1(c)</u>

The undersigned, counsel of record for Defendant Antonio Marquis "L.A." Reid, certifies

that this brief contains <u>7,977</u> words, which complies with the word limit of Local Rule 7.1(c).

Dated:  June 13, 2025

<u>/s/ Kenya K. Davis</u>
Kenya K. Davis (NY Bar #4162483)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 13, 2025, I electronically served the above document on the following:

Shawn Holley (*pro hac vice*)
Gregory Korn (*pro hac vice*)
Suann C. MacIsaac (*pro hac vice*)
Kate Mangels (*pro hac vice*)
**KINSELLA HOLLEY ISER KUMP STEINSAPIR LLP**
11766 Wilshire Boulevard, Suite 750
Los Angeles, CA 90025
sholley@khiks.com
gkorn@khiks.com
smacisaac@khiks.com
kmangels@khiks.com

*Attorneys for Defendant Antonio Marquis "L.A." Reid*

<u>/s/ Kenya K. Davis</u>
Kenya K. Davis (NY Bar #4162483)

26