UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DREW DIXON,

    Plaintiff,                                    Case No.:      1:23-cv-09878-VEC

v.

ANTONIO MARQUIS "L.A." REID,

    Defendant.

_____ /

## PLAINTIFF'S PRETRIAL MEMORANDUM OF LAW

    Plaintiff Drew Dixon ("Plaintiff" or "Ms. Dixon"), by and through her undersigned counsel, files this pretrial memorandum of law pursuant to the Court's March 10, 2025 scheduling order.

                                                      Kenya K. Davis (NY Bar #4162483)
                                                      BOIES SCHILLER FLEXNER LLP
                                                      1401 New York Ave., NW
                                                      Washington, DC 20005
                                                      (202) 237-9608
                                                      kdavis@bsfllp.com

                                                      Sigrid S. McCawley (NY Bar # 6051460)
                                                      Daniel J. Crispino (*pro hac vice*)
                                                      Amber S. Stewart (*pro hac vice*)
                                                     BOIES SCHILLER FLEXNER LLP
                                                      401 E. Las Olas Blvd., Suite 1200
                                                      Fort Lauderdale, FL 33301
                                                      (954) 356-0011
                                                      smccawley@bsfllp.com
                                                      dcrispino@bsfllp.com
                                                      astewart@bsfllp.com

                                                      *Counsel for Plaintiff Drew Dixon*

## INTRODUCTION

Ms. Dixon intends to prove at trial that Defendant Antonio Marquis "L.A." Reid ("Defendant") sexually abused her through a system of sexual assault, sexual harassment, retaliation, and coercive control while he was her boss at Arista Records ("Arista"). The evidence will show that Defendant sexually assaulted Ms. Dixon on two separate occasions, once on his private plane and once in his car. The evidence will further show that Defendant falsely imprisoned Ms. Dixon when he sexually assaulted her, and that with his actions, Defendant intentionally inflicted emotional distress on Ms. Dixon. Finally, the evidence will show that Defendant committed a crime of violence motivated by gender, violating New York City's Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-903 (2017).

The following claims remain to be tried before a jury:

1. Defendant's commission of sexual assault and battery against Ms. Dixon, as defined in Article 130 of New York's Penal Law. *See* N.Y. Penal Law §§ 130.52, 130.55, 130.60, 130.65, 130.66, 130.67.

2. Defendant falsely imprisoning Ms. Dixon.

3. Defendant's intentional infliction of emotional distress.

4. Defendant's commission of a "crime of violence" and a "crime of violence motivated by gender," in violation of New York City's Gender Motivated Violence Act ("GMVA"), N.Y.C. Admin. Code § 8-903 (2017).

## FACTUAL BACKGROUND

The Court is familiar with the background of this case. *See* ECF Nos. 28, 58, 137, 142, 147, 151, 154, and 174. Ms. Dixon is a talented music producer, executive, and entrepreneur who helped create hits such as "American Boy" (Estelle featuring Kanye West), "My Love Is Your

1

Love" (Whitney Houston), "Maria Maria" (Carlos Santana), and "A Rose Is Still a Rose" (Aretha Franklin featuring Lauryn Hill), just to name a few. *See* ECF No. 1 ("Compl.") ¶¶ 1, 42, 44, 62. In April of 1996, Ms. Dixon began working at Arista as a Senior Director of Artists & Repertoire ("A&R") and then Vice President of A&R for Clive Davis, an industry-leading music producer and CEO of Arista. *See* ECF No. 143-1, Dixon Dep. Tr. at 166:13-18; 175:22-176:21, 178:23-179:2. While working for Davis at Arista, Ms. Dixon was successful and prolific—she signed an artist shortly after starting, which was unheard of, and she consistently found big singles for existing artists. *See id.* at 168:23-169:19.

In 1999, Arista's leadership announced that Defendant would replace Davis as CEO of Arista. *See id.* at 189:20-190:15. Ms. Dixon initially agreed to move to Davis's new label, but a kidney cancer diagnosis, coupled with pressure from Strauss Zelnick, Defendant's boss, and Defendant himself made her reluctant to break her contract with Arista and leave. *See id.* at 194:14-196:10. She agreed to continue working at Arista under Defendant's leadership. *See id.* at 215:18-216:2. Soon after Defendant became CEO of Arista, his coercive control of Ms. Dixon through sexual harassment, intimidation, retaliation, and sexual assault began. What started as inappropriate flirting and comments quickly escalated to fondling Ms. Dixon under her shirts, kissing her neck, and inviting her to his hotel room. *See id.* at 210:19-212:20; 214:22-215:5; 222:3-16. Defendant's sexual abuse reached a boiling point during a flight to Puerto Rico on his private plane.

Shortly after Defendant became CEO of Arista, he announced a company-wide retreat to Puerto Rico. *See id.* at 229:17-230:10. Karen Kwak, Defendant's "person" in A&R administration, instructed Plaintiff that she did not need to book a commercial flight because the senior staff would be flying on a private plane to meet and plan presentations. *See id.* at 230:20-231:5. This was a

2

trap, because when Plaintiff arrived at the airport and boarded the plane, no other Arista staff members or executives were there. *See id.* at 237:6-9; 238:9-16; 239:4-25. Plaintiff hid in the bathroom to wait for others to arrive, but eventually she was told to exit. *See id.* at 279:2-22. Having finally gotten Plaintiff alone and after trapping her on his plane, Defendant sexually assaulted her. *See id.* at 279:17-22. Once they arrived at Puerto Rico, Plaintiff stayed in her assistant's room during the retreat and avoided Reid. *See id.* at 287:22-25; ECF No. 120-1 at 5. She flew back to New York on a commercial flight to avoid flying back with Defendant. *See id.*

Following the Puerto Rico retreat, Defendant was armed with the threat that he would that he would sexually assault Plaintiff if he got her alone. He continued his cycle of sexual harassment, coercive control, and retaliation by sabotaging Ms. Dixon's work projects when she refused to visit his hotel room. *See* ECF No. 143-1 at 375:9-15. After 10 months of Defendant rejecting her work and music projects, Ms. Dixon agreed to ride in his car to play a sample by Alice Smith, another young artist she'd discovered. *See id.* at 292:6-12; ECF No. 120-1 at 6. During this car ride, Defendant sexually assaulted Ms. Dixon again. *See* ECF No. 143-1 at 292:19-293:7.

After this assault, Ms. Dixon was depressed and suicidal. *See id.* at 298:19-24; ECF No. 120-1 at 6. Still, she continued to try to do her job as Vice President of A&R by bringing John Legend and Kanye West to audition at Arista, but Defendant sabotaged those auditions as well. For Legend, Defendant offered Ms. Dixon the budget to book a rehearsal space for Legend to perform for him live and even said he would bring other Arista staff members as well. *See id.* at 309:23-310:4. But the day of the audition, Defendant cancelled, and no one from Arista's senior staff besides Ms. Dixon attended the audition. *See id.* at 310:14-311:14. For West, Defendant allowed West to audition for him, but he then "dressed down" Ms. Dixon in a room full of other Arista executives, telling her that she was bad at her job and that the audition had been a waste of

3

his time. *See id.* at 305:3-25. Helpless in the face of Defendant's cycle of sexual abuse, sexual harassment, coercive control and retaliation, Plaintiff quit her Vice President of A&R role at Arista and enrolled at Harvard Business School but remained a consultant for Arista for the next two years to maintain a salary and health benefits. ECF No. 120-1 at 7.

## ARGUMENT

New York law and the evidence at trial will show that Ms. Dixon is entitled to a verdict in her favor on all counts in her Complaint.

### I.    Ms. Dixon Will Prove Defendant Sexually Assaulted Her.

As explained in Ms. Dixon's opposition to Defendant's motion to dismiss and strike, which this Court denied, Defendant's actions "constitute sexual offenses as defined in Article 130, including but not limited to aggravated sexual abuse, criminal sexual acts, forcible touching, sexual abuse, sexual assault, and sexual misconduct, inasmuch as Defendant intentionally and forcibly digitally penetrated and touched sexual and intimate parts of Ms. Dixon's body for his own sexual gratification." *See* ECF No. 28 at 21. In addition to satisfying the elements of numerous sections of Article 130 as required under the ASA, the evidence at trial will also show that committed a sexual battery under New York's legal standard. To recover for battery, a plaintiff "must prove that there was bodily contact, that the contact was offensive, that is, 'wrongful under all the circumstances,' and that [the] defendant intended to make the contact." *Goff v. Clarke*, 302 A.D.2d 725, 726, 755 N.Y.S.2d 493 (2003) (quoting *Zgraggen v. Wilsey*, 200 A.D.2d 818, 819, 606 N.Y.S.2d 444 (1994)). Here, Ms. Dixon's allegations more than satisfy this evidentiary requirement.

### II.    Ms. Dixon Will Prove Defendant Falsely Imprisoned Her.

4

To state a claim for false imprisonment under New York law, a plaintiff "must show that (1) the defendant intended to confine [her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Doe v. Alsaud*, 224 F. Supp. 3d 286, 295 (S.D.N.Y. 2016) (internal citations omitted). Here, the evidence at trial will show that Defendant falsely imprisoned Ms. Dixon on two separate occasions—on his private plane and in his car. *See* ECF No. 143-1 at 278:8–279:22.

Ms. Dixon testified that as part of Defendant's scheme to confine her, Karen Kwak, Defendant's right hand at Arista, instructed her not to book a commercial flight for the retreat because Defendant was flying Arista senior staff on a private plane. *See id.* at 230:18–231:5; Ex. [X], Kwak Dep. Tr. 55:24–56:8. When asked ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ms. Kwak testified, ▮▮▮▮▮ Ex. [X], Kwak Dep. Tr. 130:17-131:4. When asked, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendant testified, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Ex. [X], Reid Dep. Tr. 153:10–13. In the face of Ms. Dixon's clear memory of how she ended up on Defendant's private plane, Defendant and Kwak's "vague denials" and "memory lapses" will not be persuasive to the jury. *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("Vague denials and memory lapses ... do not create genuine issues of material fact."). *See also Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial").

### III. Ms. Dixon Will Prove Defendant Intentionally Inflicted Emotional Distress on Her.

At trial, Ms. Dixon will also prove that the Defendant committed the tort of intentional infliction of emotional distress. "The elements of intentional infliction of emotional distress are

5

(1) extreme and outrageous conduct; (2) the intent to cause, or the disregard of a substantial likelihood of causing, severe emotional distress; (3) causation; and (4) severe emotional distress." *Eskridge v. Diocese of Brooklyn*, 210 A.D.3d 1056, 1057–58, 180 N.Y.S.3d 179 (2022). Here, Defendant's conduct in forcibly touching and making bodily contact with Ms. Dixon by fondling her beneath her clothes and subjecting her to digital penetration without her consent on two occasions was extreme and outrageous, and caused Plaintiff severe emotional distress. New York courts routinely find that such behavior is sufficient for consideration by a jury on an intentional infliction of emotional distress claim. *See Cowan v. City of Mount Vernon*, 95 F.Supp.3d 624, 657 (S.D.N.Y. 2015) (denying defendant's motion for partial summary judgment on plaintiff's intentional infliction of emotional distress claim because "Plaintiff not only alleges pervasive sexual harassment, but instances of battery. Specifically, Plaintiff alleges that Miller physically touched Plaintiff in a sexual manner, including feeling her back, pinching her buttocks, slapping and/or squeezing her buttocks, grabbing her chest, and rubbing his crotch against her. . . . Moreover, when Miller locked Plaintiff into his office and exposed his penis to her, Miller pushed Plaintiff away from the door and blocked her from leaving. . . .These instances of battery, many of which Plaintiff alleges were repeated over nearly a year-long period, constitute extreme and outrageous conduct for the purpose of an IIED claim."). *See also Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F.Supp.2d 477, 491 (S.D.N.Y.1999) (finding the allegation of sexual battery (i.e., touching plaintiff's breast) in sexual harassment context sufficient to survive summary judgment motion to dismiss intentional emotional distress claim). Ms. Dixon expects the evidence at trial to show that Defendant acted extremely and outrageously with an intent to cause her severe emotional distress, and that he did in fact cause her to feel severe emotional distress.

### IV.     Ms. Dixon Will Prove Defendant Violated the GMVA.

"The [GMVA] provides a civil cause of action for "injur[y] by an individual who commit[ted] a crime of violence motivated by gender" (Administrative Code § 10–1104). The term "crime of violence" is defined as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law ... if the conduct presents a serious risk of physical injury to another, whether or not those acts actually resulted in criminal charges, prosecution or conviction" (Administrative Code § 10–1103). The term "crime of violence motivated by gender" is defined as a "crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender" (*id.*). This section was adopted verbatim from VAWA." *Breest v. Haggis*, 180 A.D.3d 83, 88 (2019). The evidence at trial will show that Defendant has committed numerous crimes of violence motivated by gender against his female subordinates.

### V.     Ms. Dixon Will Prove She Is Entitled to Punitive Damages.

"Punitive damages are [ ] available in assault actions." *Matthews v. Garrett*, 756 N.Y.S.2d 469, 470 (App. Div. 2d Dep't 2003). Such damages under New York law "may be assessed where a defendant's actions evince a high degree of moral culpability or demonstrate a wanton or reckless disregard for the rights of the plaintiff." *Solis-Vicuna v. Notias*, 898 N.Y.S.2d 45, 48 (App. Div. 2d Dep't 2010). "Punitive damages are also available under the GMVPA." *Doe v. Olive Leaves, Inc.*, No. 18-CV-5734 (HG) (TAM), 2024 WL 3048373 (E.D.N.Y. Feb. 16, 2024) (*citing* N.Y.C. Admin. Code § 10-1104(a)). In this case, the evidence at trial will show that Defendant's numerous instances of assault and harassment against his female subordinates evinces a high degree of moral culpability, and that a sizeable punitive damages award must be assessed against him to deter future conduct.

And, "[i]t is well-settled, in fact, that evidence of a defendant's net worth is properly considered given the goals of punishment and deterrence served by punitive damages." *TVT Recs. v. Island Def Jam Music Grp.*, 257 F. Supp. 2d 737, 745 (S.D.N.Y. 2003) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)); *cf. Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 318 (2d Cir. 2004) ("Evidence of wealth ... is generally inadmissible in trials *not* involving punitive damages" (emphasis added)). Similarly, "[c]ourts have been instructed to consider the wealth of the defendant" under New York state law when evaluating punitive damages to serve their purpose of punishing and deterring defendants an others from "similarly willful or outrageous misconduct." *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (Sotomayor, J.) (collecting cases in suit involving NYCHRL punitive damages); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 275 (S.D.N.Y. 2014) ("The wealth of the defendant is also relevant [under New York law], because a defendant's ability to pay impacts whether damages are sufficient to function as a punishment and a deterrent"), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). Thus, evidence of Defendant's wealth will be proper for the jury to consider at trial when determining a punitive damages award.

## VI.   Defendant's Anticipated Counterargument Will Fail At Trial.

Ms. Dixon expects Defendant to argue at trial that because Ms. Dixon referred to Defendant's sexual harassment of her in previous statements and didn't always refer to his sexual assaults somehow means that they didn't happen. The evidence at trial will show both the absurdity and falsity of this argument.

At deposition, Ms. Dixon testified countless times that her past references to Defendant's "sexual harassment" <u>included</u> not only his inappropriate verbal overtures towards her, <u>but also</u> his forced kissing her, touching her hair, groping her, <u>and digitally penetrating her</u> on the plane and in

8

the car, as that was how she (and countless other laypersons) defined "harassment" in the colloquial sense. *See Harass*, Merriam-Webster Dictionary ("harass: to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct"). Examples of this testimony, which Ms. Dixon will give at trial, include:





Ms. Dixon's testimony is supported by Dr. Raghavan's expert report, where she explains that



Dkt. 120-1 at 5 n.11. At bottom, regardless of the noun or adjective Ms. Dixon used to describe the assaults at Defendant's hands, the outcome is the same. Forced digital penetration of her vulva and vagina constitute sexual assault—███████████████████████

███████████████████████

To be sure, Ms. Dixon _did_ tell other persons that Defendant not only harassed her but digitally penetrated her against her will:



10



And to be certain, Defendant did also sexually harass Ms. Dixon as part of his *modus operandi* and intertwined system of sexual misconduct, coercive control, and cyclical retaliation, all resulting in his sexual assaults on Ms. Dixon. But none of Ms. Dixon's statements as to Defendant's sexual harassment of her precludes or changes the fact that Defendant sexually assaulted her as well, which the evidence adduced at trial will confirm.

## CONCLUSION

For all the reasons outlined above, Defendant is liable to Ms. Dixon on all claims in her Complaint.

Dated: July 21, 2025

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

/s/ Kenya K. Davis

Kenya K. Davis (NY Bar #4162483)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-9608
kdavis@bsfllp.com

Sigrid S. McCawley (NY Bar # 6051460)
Daniel J. Crispino (*pro hac vice*)
Amber S. Stewart (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
smccawley@bsfllp.com
dcrispino@bsfllp.com

astewart@bsfllp.com

*Counsel for Plaintiff Drew Dixon*