# Exhibit A

OBIDDixC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------x

 3    DREW DIXON,

 4                    Plaintiff,

 5             v.                          23 CV 09878

 6    ANTONIO MARQUIS L.A. REID, ET
      AL,
 7
                     Defendants.
 8                                         Conference
      -------------------------------x
 9                                         New York, N.Y.
                                           November 18, 2024
10                                         4:00 p.m.

11    Before:

12                     HON. VALERIE E. CAPRONI,

13                                         District Judge

14                          APPEARANCES

15    BOIES, SCHILLER, FLEXNER, LLP
           Attorneys for Plaintiff
16    BY:  KENYA DAVIS
           DANIEL CRISPINO
17         AMBER STEWART

18    KINSELLA, HOLLEY, ISER, KUMP, STEINSAPIR, LLP
           Attorneys for Defendants
19    BY:  GREGORY KORN
           BOBBI STERNHEIM
20

21

22

23

24

25
```

OBIDDixC

```
 1              (Case called; appearances noted)

 2         THE COURT:  Okay.  As I recall, Ms. Davis, you took

 3    the labor for last time.  Are you going to be taking the labor

 4    for this time?

 5         MS. DAVIS:  Yes, your Honor.  I also have Daniel

 6    Crispino and Amber Stewart on as well.

 7         THE COURT:  Yes, they are on as well.

 8         Who's going to be talking primarily for the defendant?

 9         MR. KORN:  Your Honor, this is Greg Korn.  I can

10    address a number of issues, and maybe I can speak primarily and

11    there may be some issues that Ms. Sternheim can speak to

12    primarily.

13         THE COURT:  Okay.  That's fine.  I just want to know

14    who primarily is going to be talking.

15         Let me remind you of the rules of the road.  On the

16    telephone conference, you need to identify yourself each time

17    you speak, and if you hear the bell that indicates someone has

18    come on the line, please stop talking long enough for me to

19    make sure that I still have the court reporter on the line.

20         I do have the court reporter, right, just to confirm?

21         COURT REPORTER:  Yes, your Honor.  I'm here.

22         THE COURT:  All right.  So I think, Ms. Davis, it

23    seems like this is your issue, so tell me what's the issue.

24         MS. DAVIS:  Yes, your Honor.  So this issue became

25    clear to us during our second deposition of Mr. Reid.  We had
```

1    received from Ms. Kwak, who is one of our other witnesses we

2    had deposed, indications she had text messages with Mr. Reid

3    about this particular case.  They were not text messages that

4    were provided in response to your order that you issued on the

5    11th.  We got the response of that on the 18th, 17th or 18th,

6    and we got two text messages.

7             We didn't receive -- we received like a pdf.  We

8    didn't receive the native file.  And we got, you know, one or

9    two blurbs, as opposed to the entire string, which is what we

10   produce when we produce text messages.

11            So I asked Mr. Reid about those messages, because at

12   some point Mr. Korn did produce them to us.  So in looking at

13   those messages from Ms. Kwak, we noticed that --

14            THE COURT:  I'm sorry.  How do you spell that?

15            MS. DAVIS:  K-w-a-k, and that's Karen Kwak.

16            THE COURT:  What's her involvement in this case?

17            MS. DAVIS:  She was his assistant at the time of the

18   assault.

19            THE COURT:  Okay.

20            MS. DAVIS:  We were deposing her about that time.

21   Yes, your Honor.

22            THE COURT:  Okay.  Go ahead.

23            MS. DAVIS:  Yes.  So we got the messages from

24   Mr. Korn, and we asked Mr. Reid about them during his

25   deposition.  And at first he was saying, you know, we gave him

1    a few, ah -- because we didn't see his responses to many of

2    these questions, so we were asking, did you issue voice notes?

3    Did you call the person?  There were several responses he gave,

4    maybe, possibly, but then we pointed out to him that there

5    were -- and I don't know if you have this on your phone, but

6    there are bubbles that come up as you're rehashing, because

7    someone's responding to your phone message, right, emphasize,

8    love, like.  Right?

9              THE COURT:  Yes.

10             MS. DAVIS:  So we didn't get those from Ms. Kwak on

11   Mr. Reid's side, so I asked him about those, and he said, I

12   believe I can delete my messages.  He said something to the

13   effect that there's a rule against that.  I can delete my

14   messages.

15             Of course the bells went off, because, one, he

16   received his preservation notice in this case in January of

17   '23.  That's nearly two years ago.  And, two, you know, we had

18   gone through this process of extensive discovery, discussions

19   and negotiations back and forth with defense, and we couldn't

20   -- we were having a hard time thinking about the fact that

21   these messages had been deleted by Mr. Reid, but also that

22   defense had represented that they had reviewed these messages.

23   And it hadn't occurred to them that these messages had been

24   deleted.

25             Now, what we've been offered as a remedy for this is

1    that they will do a redo of his devices, and that they will

2    provide us with access to those devices.  I mean access to

3    the -- access of the documents.

4          We are hesitant to go that route, and that's one of

5    the reasons why we're raising it with your Honor is because,

6    one, it's very clear to us that their idea of what his response

7    is to the search terms is not his responses to the search terms

8    because they missed his message.

9          Secondly, they're concerned about -- they want to use

10   their vendors.  We're concerned about their vendors because

11   their vendors were supposedly a part of the review process for

12   what we have now, and that was not successful.

13         Thirdly, we want an affidavit or declaration of some

14   point statements from the defendant that he's provided all of

15   his devices for a forensic review, cell phone, laptop, iPad

16   hard drive, because it is our impression that he was under the

17   impression that he should give over whatever he thinks is best

18   to give over, or he should provide what he thinks is best as

19   opposed to counsel telling him that he's complying with

20   counsel's request.

21         So that's where we are.  We are asking for leave to

22   file a motion to give to an adverse inference the foundation,

23   because it's a two-year inquiry, right?  This is not something

24   where, at least in my prior hearings with the AUSA, there were

25   many times that, for forensic reasons that -- we can go back

1    and see what happened a year ago, but two years is a long time.

2    And so it's my belief that there are things than cannot be

3    ready.  There could have been WhatsApp messages.  There could

4    have been other text message that aren't preserved by the phone

5    or the system, the cloud, whatever it may be, that we'll never

6    get back, and we will never know what those messages said.  And

7    so that is why we're bringing it to the Court now.

8            We certainly didn't want to file anything without

9    having had this conference with you.  We did meet with the

10   defendant and defense and they provided a proposal.  We

11   provided a counter laying out points I just gave you, and we're

12   at an impasse in terms of how to handle a forensic review.

13           THE COURT:  Let me interrupt for a second.

14           MS. DAVIS:  Yes.

15           THE COURT:  So far the only thing you have said you

16   are asking for is permission to file a motion for an adverse

17   inference because of spoliation.  Are you asking for me to get

18   involved in some sort of dispute between you and the defense on

19   a forensic review of devices and, if so, which devices are you

20   asking for a forensic review of?

21           Is that forensic review solely for purposes of

22   ascertaining whether there's been other evidence that was

23   called for and destroyed or not produced?

24           What exactly is the issue?

25           MS. DAVIS:  Yes, ma'am.  I'll run it down.

OBIDDixC

1          So of course the leave to file the motion, but, also,

2     we want complete access to the defendant's phone, laptop, and

3     other devices relevant to during this timeframe in order to run

4     our own searches for responsive documents.  We're fine with his

5     communications with his spouse and counsel being screened off.

6     Our vendor would do that pursuant to any application of marital

7     or attorney-client privilege.  But, otherwise, we can't agree

8     to limit our access on defendant's devices without ability to

9     run our own search.

10          Secondly --

11          THE COURT:  The basis for that is because why?  Why am

12     I supposed to be persuaded that the defendant hasn't done --

13     putting aside that he thought he was allowed to delete text

14     messages, why do you need not -- what's my basis for concluding

15     that the messages and emails and documents that were on the

16     devices, that the defendant's search wasn't adequate?

17          MS. DAVIS:  The reason we know that was not the case

18     is when your Honor ordered a review, a further review of his

19     text messages, the text message that is the subject of how he

20     found all this out was not included in the response that we

21     received.

22          THE COURT:  Well, wait.  I thought you said that

23     Mr. Korn did produce it to you?

24          MS. DAVIS:  He produced it after Karen Kwak testified

25     about it in a deposition and I asked her counsel to produce it.

OBIDDixC

1    And Mr. Korn then said, well, I'll produce it to you.  But he

2    didn't -- it was not -- it was not a text message that he

3    deemed responsive, nor was it a message that he looked at it

4    and said, oh, there definitely were other messages on the side

5    of this, I should do a further inquiry.  That did not happen.

6          And so that's where our -- our resistance in allowing

7    them to process this, that's what it's based on.

8          THE COURT:  Had you subpoenaed Karen Kwak for relevant

9    text messages?

10          MS. DAVIS:  No.  I subpoenaed her for a deposition.

11    In that deposition -- yes, I understand.  There wasn't a

12    subpoena duces tecum for her.

13          THE COURT:  How did this whole text stream come up?

14          MS. DAVIS:  So I asked her, because, Judge, if you

15    will remember, your Honor, one of the reasons why you ordered

16    him to give us the text messages is because he kept saying,

17    well, he wouldn't have anything to say about this, it wouldn't

18    be where he would be talking about this with anyone other than

19    his counsel.

20          Remember that conversation?

21          And we said, hey, look, there was a newspaper article.

22    There was a movie that came out.  There's, you know, a filing

23    that was filed.  Somebody had to talk to him about this and he

24    had to talk to somebody about this.  And that's why we raised

25    the issue of there has to be, you know, responsive text

OBIDDixC

1  messages after being told that there were not any.  And so when

2  we get to --

3          THE COURT:  So then during the deposition of Karen

4  Kwak, she tells you that there were text communications between

5  her and Mr. Reid about Dixon's allegations.

6          MS. DAVIS:  That's correct.  That's correct, your

7  Honor.

8          THE COURT:  All right.  So I've got the issue.

9          All right.  Mr. Korn.

10          MR. KORN:  Yes, your Honor.  So I'd like to talk about

11  the factual part of this, what text messages are at issue and

12  what was deleted and how that all came about and how we -- why

13  the text wasn't produced the first time, et cetera.  So that's

14  one side that I want to talk about.  And then I also want to

15  talk about the offer I've made as to the forensic, which we

16  think is beyond reasonable.

17          Is there one place you'd like me to start more than

18  the other?

19          THE COURT:  No.  Why don't you start with why it

20  wasn't produced.

21          MR. KORN:  Yeah.  So let me start with the facts.  So

22  the text message has -- the full text string has now been

23  produced by Ms. Kwak, so let me tell you what's in the text

24  stream.  So most of the text messages between Mr. Reid and Ms.

25  Kwak have absolutely nothing to do with this.  There are

OBIDDixC

1   photographs of them hanging out with celebrity musicians.

2   There is talk about --

3        THE COURT:  Mr. Korn, stay focused.  I don't care that

4   there was tons of other stuff that was irrelevant and wasn't

5   produced.  The question is, why wasn't the string that was

6   relevant produced?

7        MR. KORN:  The version that was in Mr. Reid's

8   possession admittedly had a couple of text messages deleted,

9   and as a result of those messages -- specific messages within

10   the stream, as a result of those being deleted, it wasn't

11   evident that the text stream was responsive at all.

12        THE COURT:  Well, that then takes it -- how is it that

13   your client was deleting text messages?

14        MR. KORN:  Yes, your Honor.  And needless to say it's

15   something that is disappointing.  Ms. Holley is not on this

16   call, and she apologizes for that.  She was going to speak to

17   this issue, because I personally wasn't involved in the case at

18   the time.  And I can speak for Ms. Holley, you know, who will

19   tell you she's -- would accept responsibility, that there just

20   was not a good enough communication with the client on this

21   issue to ensure that he fully understands that absolutely

22   nothing could be deleted.

23        What ended up getting deleted, and I should say there

24   is testimony from Mr. Reid, and it's the only message that he

25   had with this case, not with counsel, where there was a

OBIDDixC

1    deletion, it was -- he was sent a news article about the case

2    being filed by Ms. Kwak.  She then had a reference saying, I

3    don't like seeing my name involved in this.

4         He said to her, why are you sending me this?  And then

5    he said something like, this woman is a "dangerous liar."

6         That was the full text stream.  We accept

7    responsibility for the fact that Mr. Reid deleted those texts.

8    We're disappointed about it.  We're not happy about it.  And as

9    I said, Ms. Holley will accept some of the responsibility for

10    it.

11         We do have testimony from Mr. Reid he deleted no other

12    texts.  Now, that notwithstanding, we've agreed immediately

13    that a new forensic review is justified here.  So the proposal

14    we have proposed is to use a litigation forensic group that

15    specializes in this work that we've used in the past.  We would

16    pay them.  They would do a complete imaging of the phone,

17    computer, and an iPad if there is one as well.  I don't recall

18    if there is one, but if there is, that would be done.

19         We would make sure that no deleted emails were missed

20    in the searches that were done previously by the IT expert,

21    Dwayne Robinson, although we think likely those would have been

22    covered.  We would also, through the imaging in this phone, and

23    also potentially the searches of phone records, obtain any text

24    messages that were deleted but are still accessible.  And there

25    are ways to do that, because certain text messages are backed

OBIDDixC

1    up in the cloud and can be retrieved from computers.  So we

2    will strive to retrieve everything that can be retrieved.

3            The offer that we further made is while we're engaging

4    this company, plaintiff's counsel will be provided total access

5    in terms of communications with the forensic expert.  They'll

6    be allowed to speak with the forensics expert on our time, to

7    understand exactly what's occurred, and, you know, to speak

8    about the searches that are going to be done, and to know what

9    the result of those are.  They will have access.

10           Where really the offers depart in terms of the

11   forensics is that plaintiff's counsel would like to have

12   complete control, unfettered control over the data, and to run

13   whatever searches they want to run across the data without

14   getting our approval or without getting the Court's approval

15   when inevitably there's a dispute about whether a search is

16   proper or not.  And that's -- when you're considering the fact

17   that your messages with friends, family, celebrities, it seems

18   extraordinary to us that opposing counsel would have no

19   guardrails and truly unfettered access to the phone.

20           And I'm particularly concerned, your Honor, because

21   some of the questioning of Mr. Reid recently in deposition

22   demonstrates plaintiffs and defense counsel do have very

23   different ideas of what's in bounds.  And by way of an example,

24   Mr. Reid has been recently asked about consensual relationships

25   which have nothing to do with this case and are not relevant.

OBIDDixC

1   He's been asked whether he does drugs.  By the way, he doesn't.

2   He's been asked whether he allows friends of his to do drugs in

3   his presence.  These things are simply not relevant, and so I

4   have -- frankly, just don't think it's appropriate to give

5   opposing counsel total unfettered access and the discretion to

6   run any searches they want on all of his text messages, his

7   internet search history, his financial data that's on the

8   phone, et cetera.

9          So the real difference is we would control the data.

10  We would run the searches that plaintiff's counsel wants to

11  run, but if there's a dispute, we bring it to your Honor and

12  you make a ruling.  We give your Honor access to all of the

13  data retrieved by way of the searches, with the exception of

14  attorney-client privileged communications, so they can do a

15  responsiveness review themselves.

16         It just really boils down to I don't think they should

17  be allowed to run any search they want to run.

18         THE COURT:  Wait a minute.  I'm sorry.  You're going

19  to give them full access to the imaged data minus

20  attorney-client and marital privileged material?

21         MR. KORN:  No, your Honor.  Almost.

22         THE COURT:  Yes, I thought that wasn't right.

23         MR. KORN:  When the searches are run --

24         THE COURT:  I see.  Give them full hits.

25         MR. KORN:  Correct.  They would get all of the hits,

1    minus privileged communications, and which would include -- I

2    think we should have the right to review communications with

3    his spouse, obviously, so that would be included within the

4    privilege.

5        THE COURT:  All right.  So, Ms. Davis, I have to say

6    that sounds incredibly reasonable.

7        MS. DAVIS:  Your Honor, it would be if we did not have

8    the history with counsel.  He did, for instance -- he just made

9    this representation to the Court about the questions I asked

10   Mr. Reid about drugs.  It was not to get at whether or not Mr.

11   Reid used drugs.  I could care less.  It got to what was

12   Mr. Reid's credibility, because he had testified that he

13   doesn't use drugs and no one had used drugs around him.  He was

14   adamant about that.  In that text stream with Ms. Kwak, there

15   clearly was a discussion of drug use going on between the two

16   of them.  It is a credibility issue that we have.

17       The issue around the consensual relationship was not a

18   -- I did not ask him about consensual relationships.  I asked

19   him about sexual contact with subordinates, and those questions

20   were very limited and controlled.

21       We are not asking for unfettered access.  Like I said,

22   we would filter out for his counsel.  We would filter out for

23   his spouse.  But the fact that Mr. Korn ran search terms that

24   we all agreed on, and this text message we're talking about

25   today, which was one of the text messages we discussed in terms

OBIDDixC

1    of not getting the full thread, it was missed.  It was missed

2    in his review.  It was missed in his bringing -- his applying

3    the search terms.  And so we're concerned that we're going to

4    find ourselves back before your Honor in a few months having

5    done this complete process and invested time and money into it

6    and not having a full review.  And something's slipping up

7    again, because now on a third or fourth slip up in this case,

8    something comes forth, and we found it, and they say, oh, well,

9    this is just one time or one instance and we have to go back

10   and do a full review anyway.

11            So for efficiency purposes, we think it makes sense

12   for to us to do it the way we asked.  So the last point I'll

13   make is this.  He says, well, Mr. Reid admitted to deleting

14   this one text messages.  So I'll tell you exactly what Mr. Reid

15   said to me as I went through these text messages that I pointed

16   out may be related, he said, "maybe I deleted it.  I don't

17   know.  I think I can delete what I want to delete and not

18   delete when I feel like it.  I didn't know -- I didn't know

19   that there were rules around it."

20            So that's where the concerns come in.  It's not this

21   one text messages.  It's about what else is out there and what

22   else should be turned over.  And my concern is that they won't

23   turn it over.

24            THE COURT:  Except that that's not -- I mean, maybe I

25   misunderstood.  What I understand Mr. Korn to be saying is that

OBIDDixC

1    they are going to run searches through -- they're going to

2    imagine all of the devices.  They will run searches that are

3    agreed with the defense, and if there's a problem agreeing on

4    the searches, you're going to come back to me with them.  And

5    then other than privilege and marital -- other than privilege

6    material, so attorney-client privilege and marital privilege,

7    they're going to turn all of the responsive documents,

8    everything that hits on the search terms, to the plaintiff, so

9    you can review them for whatever you want.

10          I don't know how having his expert run the search

11   terms or your expert running the search terms, what's the

12   difference?  They've agreed to give full returns for everything

13   that hit.

14          MS. DAVIS:  And I'll just state my objection to this,

15   which is this is -- and this is Kenya Davis, for the plaintiff.

16   His vendors, you know, his -- the IT person that Mr. Reid had,

17   the financial person that Mr. Reid had, these are all people

18   that were trusted to turn over things that would have been

19   responsive, and that hasn't happened.  So that's where my

20   concern comes for using their vendor.

21          THE COURT:  Well, wait a minute.  Hang on a second.

22   The IT expert before was somebody found a company as I recall.

23          Isn't that right, Mr. Korn?

24          MS. DAVIS:  No.  No.  That's Mr. Reid's IT person if

25   I'm not mistaken.  Mr. Korn can correct me.

OBIDDixC

1           MR. KORN:  Your Honor, this is Greg Korn.

2           Yes, previously, the work was done by an IT

3   professional that works with Mr. Reid.  We have now engaged a

4   specialty litigation forensics company that Ms. Holley and I

5   have used in sensitive matters.  They're called Setec

6   Investigations.  This is what they do all day every day.

7           THE COURT:  Who are the principals of Setec?

8           MR. KORN:  The principal, his name is Todd Stefan,

9   S-t-e-f-a-n.  He is the owner.

10          THE COURT:  I'm not particularly familiar with them.

11  But, Ms. Davis, are you familiar with the company Setec or Todd

12  Stefan?

13          MS. DAVIS:  No, your Honor, I'm not.

14          THE COURT:  Okay.  What I'd like you to do is to do a

15  little research on him and on the company.  But assuming it's a

16  reputable third-party company that does this kind of stuff,

17  again, the offer of the defendant is incredibly generous, which

18  it should be, because the fact that you've got a defendant that

19  believes that he is entitled to delete text messages and God

20  only knows what else after a lawsuit has been filed is

21  disturbing.

22          I appreciate that a lawyer who's not on the phone will

23  fall on her sword over it, but this is serious.  There's no

24  question it's serious.  But this, as an offer of how to set the

25  plaintiff as ease, that in fact you're getting everything that

OBIDDixC

1    is responsive, seems about as good as I would come up with, and

2    they're offering to pay for it.

3        So it really comes down to whether Setec is a

4    responsible company, doesn't it?

5        MS. DAVIS:  Yes, ma'am.  I can see what you're saying.

6        If we do go with Setec, and we appreciate the ability

7    to be able to review them and, you know, really get clear on

8    whether or not this is a reputable company, and we have

9    vendors, too, now, that could do this, but I understand the

10    concern.

11        THE COURT:  I don't think the issue is really whose

12    vendor is doing it.

13        MS. DAVIS:  Right.

14        THE COURT:  Because they all pretty much use the same

15    tools.  The real issue is whether the defense is making the

16    privilege review or the plaintiff is making the privilege

17    review, and I've never seen a Court order that raw data be

18    turned over to the plaintiff and we're going to trust them to

19    create an ethical wall and winnow out privileged material.

20    That would be highly unusual.

21        MS. DAVIS:  Right.  My concept of how it would happen

22    is that the vendor would do the culling for privilege.

23        THE COURT:  Well, that is as good as their work is,

24    but it doesn't necessarily pull everything in, right?

25        MS. DAVIS:  Uh-huh.

OBIDDixC

1          THE COURT:  You're going to get stragglers that,

2    however they're doing the search, doesn't come up with it.

3          MS. DAVIS:  Okay.

4          THE COURT:  But functionally, what the defendant is

5    offering you, is the same thing.

6          So the parties need to meet and -- you need to do some

7    research on Setec.  If there's some substantive issue that you

8    have with Setec, talk to Mr. Korn.  Maybe you can come up --

9    between you, working in good faith, you can come up with

10   another vendor that both sides agree is both competent to do

11   this, has the time to do it, and will comply with the ground

12   rules there are, that the defense is going to winnow out

13   privilege material.

14         The parties will agree on search terms.  If you can't

15   agree on search terms, you're going to come to me.  And the

16   plaintiff's lawyer can have full access to the person, the

17   expert that's doing the work.

18         MS. DAVIS:  Okay.

19         THE COURT:  Have I correctly stated the conditions,

20   Mr. Korn?

21         MR. KORN:  Yes, you have, your Honor.

22         THE COURT:  Okay.  So if you can't agree on a vendor,

23   come back to me, but I'm -- actually, don't come back to me if

24   you can't agree on a vendor.  Agree on a vendor.

25         MS. DAVIS:  Yes, ma'am.

OBIDDixC

1          THE COURT:  There is no reason in the world your firms

2     can't agree on a vendor.  If you have problems on search terms

3     and you can't agree on what you're going to run on these

4     images, then you can come back to me, but I would prefer that

5     you manage to agree on it.

6          MS. DAVIS:  Okay.

7          THE COURT:  Anything further from the plaintiff, Ms.

8     Davis?

9          MS. DAVIS:  Yes, your Honor.  The two things would

10     have been the declaration affidavit, some sworn testimony or

11     statement by the defendant under the penalty of perjury that

12     he's turned over all of the devices.  And part of why I'm doing

13     this is not only for us but for current counsel that he has,

14     because his allegation to preserve predated current counsel,

15     right?

16          They were brought on I think at the beginning of this

17     year, but his obligations started back in January of '23, when

18     there were other counsel assigned to the case.  And so we would

19     want a sworn statement from him that these are the devices that

20     would be relevant.

21          THE COURT:  All right.  Mr. Korn.

22          MR. KORN:  As I understand it, it's just a declaration

23     attesting the devices that he has are being turned over to the

24     forensics expert.  That doesn't sound like that's a problem to

25     me.

OBIDDixC

1              THE COURT:  Right.  That all devices he used during

2    the relevant period of time have been turned over to the

3    forensic expert.

4              MR. KORN:  Right.  That sounds reasonable.

5              THE COURT:  It's premature to talk about a motion for

6    spoliation.  Let's see what it turns up.

7              MS. DAVIS:  Yes, ma'am.  I understand.

8              THE COURT:  There's no question that you've got --

9    there's no question that he spoliated evidence, but at the

10   moment, it looks like it was kind of a no harm, no foul, so

11   let's see if you can find a foul.

12             MS. DAVIS:  Yes, ma'am.  I understand.

13             THE COURT:  All right.  So everyone have a nice

14   holiday.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25