UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DREW DIXON,

Plaintiff,

-v-

ANTONIO MARQUIS "L.A." REID,

Defendant.

23-CV-09878 (JAV)

OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge:

Defendant moves to preclude the testimony of Plaintiff's expert witnesses, Michael Selverne, Mark Plotkin, and Dr. Chitra Raghavan, pursuant to Federal Rules of Evidence 702 and 403. ECF Nos. 115, 122. For the reasons set forth below, the motions to preclude are GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

### A. Allegations in the Complaint

Plaintiff alleges that, from 1996 to 2002, she was employed as an A&R executive at Arista Records ("Arista"). Plaintiff's employment agreements contain an "A&R Bonus" provision, which provided that Plaintiff would receive commissions as a percentage of Arista's retail sales revenue for "artists who, during your full time employment by us, enter into recording contracts with us primarily because of your efforts." In 2000, Defendant became the President and CEO of Arista. Plaintiff alleges that, between 2000 and 2002, Defendant sexually harassed her by, among other things, making flirtatious comments and frequently calling her late at

night to ask that she join him in his hotel room, and then becoming angry when she would not relent. Plaintiff alleges that Defendant sexually assaulted her on two separate occasions in 2001.

According to Plaintiff, while she was working at Arista, she and another colleague brought Kanye West ("West") in for an audition, but Defendant decided not to sign him. Plaintiff also alleges that, while she was working at Arista, she attempted to bring John Stephens, who performs under the name John Legend ("Legend"), to Arista. Plaintiff alleges that Defendant failed to attend a performance by Legend and Plaintiff ultimately was unable to offer him a deal.

Dixon departed Arista in 2002, leaving the music industry to pursue a degree at the Harvard Business School.

**B. Michael Selverne**

Michael Selverne is an attorney who, for the past 39 years, has specialized in the field of executive compensation in the music industry. ECF No. 126-1 ("Selverne Expert Rep."), ¶ 1. Over the course of his career, he has represented artists in their contract negotiations for recording and performance agreements, record executives in their negotiations of compensation packages with their employers, and music labels in their negotiations with executives. *Id.*, ¶¶ 6-12.

In connection with this litigation, Selverne submitted an expert report setting forth his opinions regarding Plaintiff's lost future compensation. In rendering his opinion, Selverne reviewed Dixon's compensation package during her time at Arista. Selverne noted that Plaintiff was hired in 1996 as a Senior Director

for a two-year term. *Id.*, ¶ 30. She earned a base salary of $90,000 and a $10,000 signing bonus, plus the bonus plan for any artist that Plaintiff was responsible for bringing to Arista. *Id.* In 1998, her term of employment was extended for another two-year term. Her base salary was increased to $175,000, with two annual increases of $25,000, and she received a signing bonus of $25,000. *Id.*, ¶ 33. Plaintiff was also promoted to the position of Vice President when one of her "designated artist" albums sold 500,000 records. *Id.* Selverne opines that the improvement in her compensation package and title in such a short time span indicates that Arista viewed Plaintiff as a "budding superstar." *Id.*, ¶ 35.

Selverne opines that, had Dixon been responsible for signing either Legend of West to Arista in 2001, she would have "solidified her reputation as one of the top talent executives in music. The likely future career path for Dixon . . . would have led to a label presidency, CEO title or a joint venture or other similar split profit/equity agreement." *Id.*, ¶ 45. Reviewing the compensation packages of contemporaries of Plaintiff who rose to the ranks of CEOs for major music labels, *id.*, ¶¶ 53-59, Selverne concludes that, if Dixon had "continued along the trajectory she was on when she departed Arista, it is highly likely that Dixon's earnings would have reached seven or eight figures annually. It is equally likely that Dixon would have created a joint venture with a major record company and see her fortunes rise into the nine figures." *Id.*, ¶ 61.

**C. Mark Plotkin**

Plaintiff retained Marc Plotkin to provide an expert opinion regarding the

hypothetical earnings Plaintiff would have received from her A&R commission structure had she successfully signed West and Legend. ECF No. 114-3 ("Plotkin Expert Rep.") at 75. Plotkin holds a Bachelor of Arts degree from a joint program between Case Western University and The Cleveland Institute of Music and has over two decades of diverse experience in the music industry. *Id.* Plotkin is a member of the Recording Academy, co-founded Decision Desk and Wifi Music School, and is the founder and CEO of Beast Music A.I., a media platform utilized by record labels such as RCA Records and Atlantic Records. *Id.* Plotkin further serves as a Professor and the Area Head of Business and Technology at New York University's Clive Davis Institute of Record Music. *Id.*

To calculate Plaintiff's "lost commissions," Plotkin created a web-based interactive version of his report. *Id.* at 1. Plotkin first looked to Plaintiff's employment agreement for the relevant formula, which included: varying percentages based upon such factors as domestic vs. international sales and the type of income (e.g., album sales, singles, EPs and ancillary income from movies or television); payment terms; calculations of revenue streams; fiscal year categorizations; and the methodology for calculating net revenues from sales (which includes accounting for cross-collateralization and charge backs). *Id.* at 2-3.

Plotkin then researched West and Legend's first contracts with Def Jam and Columbia Records, respectively, as well as their sales data year by year to ultimately determine how many records and singles were sold across various mediums and the price per unit. *Id.* at 4-71.

Plotkin's interactive report allows the reader to set as variables the duration of time Plaintiff remained at Arista, and West and Legend's respective rates for music royalties and ancillary incomes, which then would yield a commission amount based upon the formula set forth in Plaintiff's employment agreement. *Id.* at 71. For example, if Dixon is assumed to have left Arista in 2010, and music royalties are set at 15% for each artist, Plotkin calculates that Plaintiff would have received $6,234,855 in commissions from West, and $1,866,584 from Legend. *Id.* at 73-74.

**D. Dr. Chitra Raghavan**

Plaintiff retained Dr. Chitra Raghavan to conduct a psychological evaluation of Plaintiff. Dr. Raghavan is a "licensed clinical psychologist with more than twenty years of experience." ECF No. 120-1 ("Raghavan Expert Rep.") at 24. Dr. Raghavan received her doctorate in clinical and community psychology at the University of Illinois at Urbana-Champaign and post-doctoral training at Yale University. *Id.* Currently, Dr. Raghavan serves as a Professor of Psychology, Director of the Forensic Mental Health Counseling Program, and Coordinator of Victimology Studies in Forensic Psychology at John Jay College of Criminal Justice. *Id.* She has previously "testified as a witness for the prosecution in other cases regarding the effects of traumatic abuse and coercive control" and given over "150 conference presentations and . . . published over forty articles in various publications" on subjects related to domestic violence, sex trafficking, and trauma. *Id.*

Dr. Raghavan's psychological evaluation of Plaintiff was conducted in three

separate sessions for a total of 16 hours. *Id.* at 3. Dr. Raghavan conducted a general clinical interview with Plaintiff "using a mixture of semistructured questions as well as open-ended queries" to "systematically explor[e] [Plaintiff's] narratives around her childhood and her experiences with Mr. Reid covering topics such as how they met, what Mr. Reid offered, in-depth interrogations around coercion, sexual abuse, and Ms. Dixon's feelings and motivations around her actions and experiences." *Id.* at 9. She also administered a number of assessments and structured interviews. *Id.* at 9-10.

Dr. Raghavan explains that her opinions focus on:

> 1. The extent to which [Defendant] inflicted sexual, physical, and/or emotional abuse on [Plaintiff] sometime between 2000 and 2002 when she worked at Arista Records as Senior Director and later Vice President of Artists and Repertoire (A&R).
>
> 2. The mental health consequences that [Plaintiff] suffered as a direct result of the abuse inflicted by [Defendant], if any.
>
> 3. Whether the physical, sexual, and emotional abuse and its consequences have disrupted any other areas of [Plaintiff's] life; and
>
> 4. Treatment recommendations.

*Id.* at 3.

Dr. Raghavan opines that she "found Ms. Dixon's reported history to be believable" because she reported a decrease in recent symptoms rather than an increase, a pattern that would be typical of malingerers; Plaintiff's emotional and physical responses were consistent with the experiences she relayed; she was able

to clearly explain the abuse fact pattern and her narratives over multiple interviews; and three objective tests indicated that she responded genuinely about her mental health. *Id.* at 10-11.

She further opines that Defendant "used numerous tactics of coercive control to maintain his abusive power" over Plaintiff, including physical violence, manipulation, sexual abuse, retaliation, and microregulation. *Id.* at 21. Dr. Raghavan opines that the "sexual assaults and the atmosphere of coercion and hostility" that Plaintiff suffered triggered a severe episode of Complex PTSD. *Id.* at 1. Dr. Raghavan opines that it was Defendant's "sexual assaults and his entrapping hostile and coercively controlling behaviors [that] were directly responsible for many of [Plaintiff's] psychological disturbances." *Id.* at 2.

In terms of injuries, Dr. Raghavan detailed the basis for her diagnoses that Plaintiff meets the diagnostic criteria for Complex PTSD, PTSD, and major depressive disorder. *Id.* at 12-17. She then opines:

> Ms. Dixon's initial success and later dreams of a career in the music industry were shattered by Mr. Reid's abuse and his actions. As described earlier, Ms. Dixon could not advance without Mr. Reid's support, and he would not support her without her giving in to his sexual assaults. Protracted betrayal (from a mentor and leader in Black music, followed by his supporters and entourage) and the accompanying injustice harm one's well-being in a very particular way. For Ms. Dixon, it created a sense of hopelessness, despair, and loss of faith in the world. The shattering of trust cannot be regained easily. Further, the years that Ms. Dixon lived with despair, shame, and numbed feelings were existentially painful. That is, from feeling excitement, curiosity, and being alive, she felt dead, hopeless, ashamed, and without a future other than caring for her children. Nothing can return that feeling of

> excitement, aliveness, or delight that Ms. Dixon felt daily under Clive Davis—that innocence has been destroyed by the casual cruelty of a determined predator. However, creating appropriate restitution that allows Ms. Dixon to at least be financially able to pursue her creative dreams might address a small fraction of her pain.

*Id.* at 17.

Dr. Raghavan concludes that, "despite her life being hijacked by the selfish predatory needs of Mr. Reid, Ms. Dixon is determined to succeed. Financial reparation cannot return her to her younger self, but it can at least allow her to move forward and protect herself during her most fragile moments." *Id.* at 22.

**LEGAL STANDARD**

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Trial courts serve an important role as "gatekeepers" under Rule 702, responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

"In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up).

"[I]n addition to the indicia of reliability identified in Rule 702, a trial court may consider the criteria enumerated in *Daubert*." *In re Acetaminophen – ASD-ADHD Prod. Liab. Litig.*, 707 F. Supp. 3d 309, 335 (S.D.N.Y. 2023) (citation omitted). "The *Daubert* factors are: (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate and the existence and maintenance of standards controlling the technique's operation; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community." *Id.* (*citing Daubert*, 509 U.S. at 593-94).

The *Daubert* factors do not provide a "definitive checklist," however, as the *Daubert* inquiry is "fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266. A court must ultimately "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In conducting this analysis, the Court must "undertake a rigorous

examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595).

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Kumho Tire*, 526 U.S. at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997)). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (citation omitted). Similarly, the Court should "exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quotation omitted).

On the other hand, if the expert's analysis is not so unfounded as to meet this standard, then gaps, assumptions or inconsistencies properly bear on the weight of the evidence, rather than admissibility. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## DISCUSSION

### A. Expert Opinions Regarding Loss of Future Earnings

"Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation omitted). The benchmark for any such calculations should be the income earned by the plaintiff in prior years, including median income in the years immediately prior to plaintiff's departure from employment. *Phelps v. CBS Corp.*, No. 17-CV-8361 (AJN), 2020 WL 7028954, at *4–5 (S.D.N.Y. Nov. 30, 2020); *Dershowitz v. United States*, No. 12-CV-08634 (SN), 2015 WL 1573321, at *32 (S.D.N.Y. Apr. 8, 2015) ("The starting point to determine the value of past and future lost earnings is a decedent's gross income at the time of death." (cleaned up)); *Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 480 (S.D.N.Y. 1998) (admitting expert projections regarding future earnings where it was not based on speculation that a future freelance business might flourish, but grounded instead in historical data regarding past earnings). Expert testimony as to lost earnings that is not grounded in a sufficient factual foundation should be excluded. *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983).

Selverne does not purport to calculate Plaintiff's lost earnings based on her actual compensation at the time she left Arista. Indeed, he does not purport to

calculate her lost earnings at all. He does not, for example, specify how long Plaintiff would have expected to work in the industry, with reference to verifiable statistics regarding longevity in the industry or even actuarial tables reflecting life expectancy. He does not calculate the value of lost benefits.

Selverne's lack of methodology in reaching his opinion on future earnings loss is reflected in his failure to quantify such damages. Selverne vaguely asserts Plaintiff suffered damages in the range of millions to hundreds of millions of dollars. But such an opinion is of little assistance to a jury.

Selverne's opinion also rests on inherently speculative assumptions. Selverne conjectures that Plaintiff not only would have continued to have a successful career in the music industry, but that she would have reached the pinnacle of the profession to become the CEO of a major record label or otherwise enter into a lucrative joint venture agreement. These hypothetical promotions, bonuses, and business deals lack sufficient evidentiary foundation, and thus cannot form the basis of an expert opinion. *Pogil v. KPMG L.L.P.*, No. 21-CV-7628 (LTS) (BCM), 2024 WL 1208909, at *13 (S.D.N.Y. Mar. 21, 2024); *see also Dershowitz*, 2015 WL 1573321, at *33-*34 (rejecting as speculative calculations of future earnings that were neither based on historical earning data nor linked to earnings of reasonable comparators). Indeed, his conclusion that Plaintiff's lost earnings could range anywhere from seven to nine figures annually highlights the inherently speculative nature of his opinion.

Accordingly, Selverne's opinions are too attenuated and lacking in reliability

to permit them to be submitted to a jury. His testimony is excluded in its entirety.

In contrast to Selverne, Plotkin's expert opinion does include specific calculations, produced pursuant to an ascertainable methodology. Plotkin's expert report sets forth in detail each step in his analysis, as well as all data inputs. Defendant for the most part does not challenge his calculations or his methodology.

Defendant does take issue, however, with Plotkin's use of historical data regarding record sales as the basis for his opinion. Defendant argues that the use of such data renders Plotkin's opinion unreliable, as it rests on the faulty assumption that West and Legend would have released the same albums while at Arista and thus earned the same revenues. ECF No. 125 ("Def. Br.") at 20. Yet these are the types of assumptions that go to the weight of the evidence, not admissibility. The use of historical data may not provide exactitude, but allows for calculations to a reasonable certainty, which is all the law requires. *See, e.g.*, *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 994 (2d Cir. 1991)

Any calculation of future earnings is to some extent a predictive exercise, subject to a degree of uncertainty. How long would a person have worked? How long would they be expected to live? How long would they have stayed at a particular job? Would they have been promoted or received bonuses? Would they have been subject to lay offs or medical crises that would have limited their earnings? Would they have changed their careers at some point in the future? That future events are inherently unknowable does not mean future earnings are unrecoverable. Rather, the uncertainty highlights why courts insist that any such

calculations be grounded in a sufficient factual predicate, to ensure that damages can be reasonably estimated.

Defendant also argues that the entirety of Plotkin's opinion is speculative, in that it is unknown whether these artists would have signed to Arista if offered the chance or that they would have been deemed Dixon's designated artists if they had done so. Def. Br. at 19-20. Defendant misapprehends the nature of Plotkin's inquiry. Plotkin is not purporting to offer an opinion as to whether West or Legend would have signed to Arista, or if they had whether Dixon would have been responsible for signing them. His opinions are limited to a calculation of what commissions Plaintiff would have been entitled to under the terms of employment contract in the hypothetical world where she was responsible for signing the artists while at Arista. In contrast to Selverne, this opinion would be of assistance to the jury, as it provides the jury a means of calculating damages if they, as the fact finders, determine that Defendant is liable for the loss of commissions.

### B. Dr. Raghavan's Proposed Testimony Regarding Plaintiff's Credibility

The Second Circuit has made clear that "the credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial. . . . Even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible, although such witnesses may be permitted to testify to relevant physical or mental conditions." *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *on reh'g*, 856 F.2d 5

(2d Cir. 1988) (cleaned up); *see also Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.").

Consistent with this principle, in cases involving allegations of sexual assault, an expert cannot testify that the defendant in fact sexually assaulted the plaintiff or vouch for the victim. *United States v. Eagle*, 515 F.3d 794, 800 (8th Cir. 2008). An expert can only testify that "the evidence is consistent or inconsistent with the victim's allegations of sexual abuse." *Id.*

Dr. Raghavan's anticipated testimony is replete with improper opinions regarding witness credibility and bolstering. Plaintiff seeks to offer into evidence Dr. Raghavan's opinion that she "found Ms. Dixon's reported history to be believable." Raghavan Expert Rep. at 10-11. Her expert report describes Defendant as a "determined predator" whose "casual cruelty" destroyed Plaintiff's innocence. *Id.* at 17. Dr. Raghavan opines that Defendant exercised coercive control over Plaintiff through such tactics as physical violence, manipulation, sexual abuse, retaliation, and microregulation. *Id.* at 21. She opines that Defendant's "sexual assaults and his entrapping hostile and coercively controlling behaviors were directly responsible for many of [Plaintiff's] psychological disturbances." *Id.* at 2. Such bolstering testimony regarding the truth of the underlying factual allegations in the case is not the proper province of an expert witness. *See Mathie v.*

*Fries*, 935 F. Supp. 1284, 1295 (E.D.N.Y. 1996), *aff'd*, 121 F.3d 808 (2d Cir. 1997) (excluding expert testimony that plaintiff "was likely the victim of a series of sexual assaults").

Plaintiff argues that Dr. Raghavan's testimony is akin to the expert whose testimony was permitted in *Discepolo v. Gorgone*, 399 F. Supp. 2d 123 (D. Conn. 2005). ECF No. 147 at 11. But if anything, that case further undermines her position. In *Discepolo*, the expert psychologist diagnosed plaintiff with PTSD and opined that her PTSD was "consistent with" a person who suffered sexual assault. 399 F. Supp. 2d at 129-30. The expert did not offer any opinion that sexual abuse caused plaintiff's psychological conditions. *Id.* at 124 n.1. In holding that this testimony was admissible, the court differentiated it from testimony that risks "invading the province of the jury by impermissibly vouching for the credibility of the plaintiff" by "opining that the plaintiff's allegations are credible or that the expert believes the plaintiff." *Id.* at 130. That case stands in stark contrast to this one, where Dr. Raghavan does seek to testify as to credibility and causation.

Plaintiff also points out that the Second Circuit has previously rejected a challenge that Dr. Raghavan's testimony constituted improper witness bolstering. ECF No. 147 at 7. But in that case she "did not directly opine on the credibility of [the victims'] testimony, but rather provided general testimony about the dynamics of sex trafficking relationships. Courts have routinely held that such background testimony is not impermissible bolstering." *United States v. Rivera*, No. 22-2780-CR, 2024 WL 2813548, at *3 (2d Cir. June 3, 2024), *cert. denied sub nom.*, *Rivera v.*

*United States*, 145 S. Ct. 1099 (2025). The proposed testimony here is not limited to background on coercive control, but instead opines that Reid exercised coercive control over and sexually assaulted Plaintiff, causing her psychological symptoms. That is a far cry from the testimony at issue in *Rivera*.

Accordingly, the Court holds that Dr. Raghavan is precluded, pursuant to Rules 702 and 403, from offering testimony at trial regarding Plaintiff's credibility, including an opinion that Plaintiff was the subject of a sexual assault by Defendant or that Defendant exercised coercive control over Plaintiff. She is also precluded from opining on the causation of Plaintiff's conditions. Dr. Raghavan can testify, however, as to coercive control generally, as background; her diagnoses of Plaintiff's mental health conditions and the bases for her diagnoses; and that Plaintiff's condition is "consistent with" that of individuals who have been sexually assaulted.

## CONCLUSION

For the reasons stated herein, Defendant's motion to preclude the testimony of Michael Selverne is granted. The motion to preclude the testimony of Mark Plotkin denied. The motion to preclude the testimony of Dr. Raghavan is granted in part and denied in part. The Clerk of Court is directed to terminate ECF Nos. 115 and 122.

SO ORDERED.

Dated: August 21, 2025
New York, New York

Jeannette Vargas

JEANNETTE A. VARGAS
United States District Judge